[No. S018033. Apr. 3, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
PRENTICE JUAN SNOW, Defendant and Appellant.

44

**COUNSEL**

Rodger Paul Curnow and Debi A. Ramos, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Ellen Birnbaum Kehr, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—Prentice Juan Snow was convicted in 1990 in Los Angeles County Superior Court of the first degree murder of Alfred J. Koll. (Pen. Code, § 187; all further statutory references are to this code unless otherwise specified.) The jury also sustained a special circumstance allegation that defendant intentionally killed Koll to prevent his testimony in another criminal proceeding (§ 190.2, subd. (a)(10)) and an allegation that defendant personally used a firearm in the commission of the murder (§ 12022.5). The jury set the penalty at death. (§ 190.3.)[1] This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

### FACTS

*Guilt Phase Evidence: Prosecution*

*Overview*

Alfred J. Koll was shot to death in his Pasadena pharmacy on November 3, 1980. Although several witnesses saw the assailant, who wore a motorcycle helmet with a dark visor, or bubble shield, over his face, none were able to identify him. The evidence linking defendant to the killing was circumstantial: in addition to evidence of motive (defendant was facing trial for robbing Koll) and opportunity (the killing occurred during the lunch recess of the robbery trial, a short distance from the courthouse), there was evidence defendant owned a motorcycle and helmet, one of defendant's fingerprints was found on a bubble shield police recovered from a Pasadena street on the day of the killing, and the phone number of the Koll pharmacy was found in a notebook in defendant's car.

*The Robbery Trial*

On August 27, 1979, two men robbed Koll of cash at his pharmacy, located at 939 East Walnut Street in Pasadena. Defendant and James Phillips were charged with the robbery and with felony assault. At the preliminary examination, Koll identified defendant as one of the robbers.

On November 3, 1980, the robbery case was scheduled for trial in a department of the Los Angeles County Superior Court located in the Pasadena courthouse. Koll had been subpoenaed as a witness and was on call if

---

[1]Defendant was previously convicted and sentenced to death on the same charges. We reversed the earlier judgment in *People v. Snow* (1987) 44 Cal.3d 216 [242 Cal.Rptr. 477, 746 P.2d 452], because of the prosecutor's misuse of peremptory challenges in jury selection.

needed. During the morning session, before court and counsel started to select a jury, the prosecutor, Gerald Haney, and defense counsel, Adolfo Lara, discussed a disposition by plea. Haney offered to drop the assault charge if defendant pled guilty to robbery. According to Haney, Lara left the room to talk to defendant, then returned and said, "My guy wants to think about it over—during the lunch hour." Around 11:30 or 11:45 a.m., court recessed until 1:45 p.m.

At the beginning of the lunch break, a bailiff saw defendant make a telephone call from the hallway just outside the courtroom. Brother Ed Bryant, an acquaintance of defendant, saw him sometime between 11:30 a.m. and noon in the hallway. Bryant invited defendant to join him for lunch, but defendant declined, saying he had something else to do.

While in his office during the lunch hour, Haney learned that Koll had been shot and killed. He returned to the courtroom around 1:25 p.m. When defendant and his attorney, Lara, entered, Haney asked Lara whether his plea offer had been accepted. Lara answered that his client wanted to go to trial. Haney then told Lara and defendant that Koll had been killed. While Lara reacted with incredulity, defendant had no reaction at all, "not a flicker of emotion." A Pasadena police officer who witnessed the conversation agreed that Lara reacted with surprise and disbelief, while defendant had "no reaction whatever."

Police arrested defendant later that afternoon, during a recess in the robbery trial. When officers sought to test defendant's hands for gunshot residue in a conference room just outside the courtroom, defendant asked to use the bathroom first and, when he was refused, became agitated, yelling, "I got to take a piss, I got to take a piss." The residue test proved negative, but, according to an expert, this result was inconclusive as to whether defendant had fired a gun; residue would be absent if a shooter wore gloves while firing, and could be washed off the hands or removed by incidental rubbing.

### Eyewitnesses

Koll's pharmacy, at 939 East Walnut Street, was near the corner of Walnut and Mentor Avenue. Two witnesses who worked in the Pacific Telephone training center at 959 East Walnut were eating lunch outside their building about 12:20 p.m. on November 3, 1980. They noticed a man walking by who, despite the hot weather, was wearing a denim jacket and pants, gloves, and a blue motorcycle helmet with a smoky-colored shield covering the man's face. The man was about five feet eight inches tall, and the skin of his wrist, which one witness saw, was dark. The man crossed

Mentor and turned the corner onto Walnut. A few minutes later, these witnesses saw the same man running in the opposite direction, holding his hand to the helmet as if to keep it from falling off.

In the same building as the pharmacy were a dentist's office and, directly across the hall from the pharmacy, a hearing aid center. Between 12:15 and 12:30 p.m. on the day of the killing, the dentist, Loran Kitch, and his secretary-bookkeeper, Donne Rogers, returned from lunch. They stopped briefly to speak to Koll, then went into the hearing aid center to talk to Carmen Saad, who worked there. As they stood talking, Rogers saw a man of medium height wearing a denim jacket and pants, gloves, and motorcycle helmet she described as green or bluish-green walk from the elevator area into the pharmacy. Immediately thereafter she heard gunshots. The shots were in two groups of two or three, with a pause in between. The witnesses took cover, but Saad, looking into the pharmacy, was able to see the gunman's extended arm and the gun; the man's wrist had "dark skin but not real black." Kitch, while getting a phone with which to call the police, glanced at the pharmacy and saw an arm extended over the pharmacy counter. After a few minutes, Kitch and Saad ventured into the pharmacy. Koll was lying on the floor behind the counter, his legs tangled in a stool. Kitch could find neither a pulse nor respiration. He called the police again.

*The Crime Scene*

The police dispatcher reported shots fired at the pharmacy between 12:30 and 12:40 p.m. At the pharmacy, responding officers found Koll lying on the floor behind the counter, dead of multiple gunshot wounds. There were bullet holes in the plywood door separating the customer area from Koll's work area, and splintered wood on Koll's shirt. Koll held a prescription bottle in his hand, and capsules were scattered on the floor. The cash register was closed, though the safe door was ajar. However, Koll's wife, Gladys Koll, testified that she examined the pharmacy premises after her husband's death, checked inventory and cash against records, and determined that neither money nor any controlled pharmaceuticals were missing.

Investigators at the scene recovered bullets or fragments under Koll's leg and on shelves. Two bullets were recovered from Koll's body in the autopsy. He had been shot seven times, including three shots to the back and one to the chest. An investigator trained in crime scene reconstruction opined, based on the condition of the crime scene, that one or more shots had been fired from the entry of the pharmacy, followed by several other shots from a point closer to Koll.

A firearms examiner testified that the projectiles found at the scene and in the autopsy had all been fired from the same revolver. The bullets recovered

from Koll's body were identified as .35- or .38-caliber hollow points. Police later found a .38-caliber bullet casing in defendant's car and four rounds of .38-caliber target shooting ammunition in defendant's apartment.

### The Bubble Shield and Helmet Liner

While driving from another part of Pasadena to the crime scene around 12:40 p.m., Pasadena Police Officer John Krayniak noticed a bubble shield from a motorcycle helmet and a cloth hood or liner lying in the street near the intersection of Mountain Street and Mar Vista Avenue. When he arrived at the pharmacy, a sergeant told him to go back and retrieve the items. Krayniak and his partners located the shield and liner about 50 feet from where they had previously seen them. Krayniak put them each in a brown paper bag and returned to the pharmacy, where he gave the bags to investigator David Harris. He did not take the shield to the courthouse at any time that day.

On cross-examination, Officer Krayniak testified that later on the day of the killing, he helped prepare an affidavit for a search warrant and reviewed it before it was presented to the judge. The affidavit, signed by investigator Harris, stated that Krayniak had brought the bubble shield to the police department, where Harris examined it. Krayniak testified, however, that that statement was erroneous; he gave Harris the shield at the pharmacy, not at the police department.

Investigator Harris testified he received the bubble shield and liner from Officer Krayniak at the pharmacy about 2:30 p.m. He took the shield back to police headquarters shortly after 3:45 p.m. and gave it to Joseph Downs, a police fingerprint technician. Downs confirmed that Harris had given him the shield, in a brown paper bag, at 3:30 or 3:45 p.m.

Downs found that a latent fingerprint lifted from the inside of the shield matched an exemplar of defendant's left middle finger. The identification was verified by fingerprint experts for the Los Angeles County Sheriff's Department and the Los Angeles Police Department.

The bubble shield, which was designed to snap onto a helmet, had small amounts of blue paint on its snaps. Pasadena Police Officer John Knebel, who had arrested defendant on unrelated charges in May 1980, testified that at that time defendant was wearing a motorcycle helmet whose blue color matched that on the shield snaps.

Pat Booker, who had been living with defendant for several years in the period before the crime, testified that defendant had owned a motorcycle and

a helmet with a bubble shield attached, and that he had at some point spray painted the helmet, as well as the motorcycle gas tank, blue. The painting was done outside the rear stairwell of their apartment building, near a metal post set in concrete. The top of the post was covered in blue paint, which Officer Knebel testified was similar to the color of the helmet defendant was wearing when arrested in May 1980. Stephan Schliebe, a criminalist, compared the blue paint specks found on the bubble shield snaps with the blue paint on the metal post from defendant's apartment building. From microscopic examination and spectroscopic testing, Schliebe concluded the two paints had similar physical and chemical properties and could have come from the same source.

### The Spiral-bound Notebook

Pursuant to a warrant, police searched defendant's Buick Riviera automobile. In the visor above the front passenger seat, they found a small spiral-bound notebook. On one page was written the telephone number of Koll's pharmacy. On another page was written the name and address of a store run by defendant's stepmother, Jacquelyn Snow, who testified she had given defendant that information the Sunday before November 3, 1980, and had urged him to come see her new store. Although at trial Mrs. Snow could not remember whether she had written the information for defendant or given it to him orally, she told an investigator prior to trial that she saw defendant as he drove by her church, told him about the new store, and saw him write the name and address in a small notebook.

A document examiner compared the telephone number and store address with an exemplar of defendant's writing, finding "very good indications" that defendant had written the telephone number and store address. Downs, the fingerprint technician, recovered latent prints from the inside of the front and back covers of the notebook; they matched defendant's exemplar fingerprints.

### Travel Time Between Locations

Police investigator Harris testified to distances and travel times between various points in Pasadena. From the courtroom where the robbery trial took place (in the courthouse at 300 East Walnut Street) to the supermarket parking lot where defendant's car was found by police later that day was about 150 yards and took three minutes on foot. From the supermarket to a parking spot near the pharmacy (at Locust Street and Wilson Avenue) took about four minutes by automobile at posted speed limits. Walking from that spot to the pharmacy building (at Walnut Street and Mentor Avenue),

ascending to the pharmacy on the second floor by the stairs, descending by elevator, and walking back to Harris's car at Locust and Wilson took seven and a half minutes. By car from Locust and Wilson to defendant's apartment building on Washington Boulevard near El Molino Avenue was 1.9 miles and took about six and a half minutes. From defendant's apartment building back to the supermarket parking lot took four minutes to drive. Including a walk back to the courthouse, the total travel time was 28 minutes. In addition, Harris timed a route from his parking spot at Locust Street and Wilson Avenue north on Wilson to Mountain Street, west to Los Robles Avenue, and south back to the supermarket parking lot. This took seven minutes to drive.

### Defendant's Prior Testimony

Over defense objection, the prosecution introduced parts of defendant's testimony from his first trial as part of its case-in-chief.

Defendant denied killing Koll or being at the pharmacy on November 3, 1980. He testified that his robbery trial recessed about 11:45 a.m. on that day. He talked to his attorney, to Brother Ed Bryant, and to another acquaintance, Curtis Moore, before finally leaving the building around 12:10 p.m. He walked to his car, which he had parked in the supermarket lot diagonally across from the court building.

During the afternoon, defendant was asked to take a gunshot residue test and agreed. While in the conference room for the test, an officer (Knebel) took a bubble shield from a paper bag and thrust it at defendant, asking if it was familiar to him. Defendant said it was not and pushed it away. The bubble shield introduced at trial did not belong to him.

Defendant testified he had owned a blue motorcycle helmet, but it was stolen months before Koll's killing. The helmet was blue when he acquired it; he did not paint it. The spiral-bound notebook was his, but he did not write the Koll pharmacy telephone number in it.

### Guilt Phase Evidence: Defense

Defendant's attorney in the robbery case, Adolfo Lara, testified that he had advised defendant that, based on the photographic lineups he had seen, there was a "misidentification issue" in the case. On the morning of the Koll killing, defendant wore dress slacks, a sports coat, and a shirt and pullover sweater to court. Before the lunchtime recess, Lara discussed Prosecutor Haney's plea offer with defendant, but they reached no final decision. Lara

suggested to Haney that they wait until the afternoon before determining whether the case would be resolved by plea or trial. He denied, however, telling Haney "[his] man wants the noon hour to think it over."

After lunch defendant was dressed as before and was not disheveled or perspiring. According to Lara, defendant was not present when Prosecutor Haney told Lara of Koll's death. After learning of it from Haney, Lara told defendant privately, outside the courtroom.

On the day of the homicide, Joe Ingber, an attorney, was trying a criminal case in the courtroom adjacent to that in which the Koll robbery case was being tried. During the afternoon, Ingber saw a Pasadena police officer, Eugene Gray, confer with another officer, and perhaps another person, at the back of the courtroom. One of the people took a dark motorcycle helmet, with visor, out of a paper bag. The helmet had nothing to do with the case Ingber was trying.

Two women who worked in the Pacific Telephone training center testified that on the day of the homicide they went to lunch at a deli across the street from the pharmacy. As they were returning, around 12:20 or 12:30 p.m., a motorcycle sped in front of them. The driver, who one witness said was a White male, was wearing a white helmet with a smoked face shield and a blue windbreaker.

Another woman, who worked on Locust Street about a block from the pharmacy, saw a man walk by during the noon hour wearing a blue motorcycle helmet. She told the police she did not think he was Black; he could have been White or Mexican.

Pasadena Police Officer Denis Petersen was riding with Officers Krayniak and Gregory Gray when they saw, and then returned to retrieve, the bubble shield and helmet liner. At a previous hearing, Petersen testified that the officers had found a face shield and *helmet.*

Kenneth Carson's prior testimony was read to the jury. On November 3, 1980, around 6:00 p.m., he went to the Pasadena Police Department with Pat Booker (defendant's cohabitant) and another friend. After Booker spent about 30 minutes in the police department building, the three drove to the nearby supermarket where defendant had parked his car. It was not yet fully dark. The doors and trunk of defendant's car were open, and two people were in the backseat. Carson and his companions abandoned their effort to retrieve the car and left.

Pat Booker was unable to remember details of the day of the homicide. At a previous hearing, however, she testified that when she came home to the

apartment she shared with defendant on that day, before police arrived to execute the search warrant, the apartment was in disarray and someone else had been there.

The defense presented Ramesh Kar, a materials scientist, to challenge the paint comparison tests performed by the prosecution expert, Stephan Schliebe. Based on differences in the amounts of zinc, magnesium, silicon and titanium in samples of paint from the bubble shield snaps and the metal post, Kar concluded they were not the same paint.

Testifying on his own behalf, defendant denied having either robbed or killed Koll. On the morning of November 3, 1980, he parked his car in the supermarket lot across from the courthouse and attended the morning court session. Just before court recessed, Defense Attorney Lara and Prosecutor Haney retired to the judge's chambers. Lara came out and told defendant the prosecutor had offered a plea bargain. Court then recessed at 11:45 a.m. or noon, and Lara told defendant to meet him at his office at 1:00 p.m.

Defendant telephoned his home, then talked with Brother Ed Bryant and Curtis Moore for a few minutes. He went to the supermarket at 12:15 or 12:20 p.m., bought some food and ate it in his car, staying there for 20 or 30 minutes. About 12:45 p.m., he left on foot for Lara's office. After they talked, he went up to the courtroom hallway and waited for court to resume.

During the afternoon session, Lara informed him privately that Koll had been killed over the lunch hour. Later, he was asked to take a gunshot residue test and agreed; he did not ask to use the bathroom first. While defendant was in the attorney conference room for the test, Sergeant Lynn Froistad came in with a paper bag, which he handed to Officer Knebel. Knebel took out a bubble shield and pushed it at defendant, asking if it looked familiar. Defendant pushed it away with his left hand.

Defendant further testified that prior to November 3 Lara had told him that Koll had identified two or three other people as the robber. Defendant had therefore thought the prosecution had a weak case and had wanted to go to trial for that reason.

Defendant testified he bought a motorcycle in April 1980 and gave it to his nephew in August or September of that year. He spray painted the gas tank blue. His helmet was also blue, but he never painted it; it was blue when he bought it. Sometime between June and August 1980, the helmet, with its smoky bubble shield, was stolen from behind defendant's apartment building.

Defendant did not remember having a .38-caliber cartridge casing in his car. He did, however, have some such casings, as well as some .38-caliber target shooting rounds; he collected these at the firing range, kept them in a locking ammunition bag, and traded them back to the range for .22-caliber ammunition.

Defendant acknowledged owning the small spiral-bound notebook; it was of a type he used in his home darkroom to record color formulas. He never put any of the notebooks in his car, however, and he never wrote the telephone number of the Koll pharmacy in the notebook.

On cross-examination, defendant was impeached with three felony convictions: his 1984 conviction for the Koll pharmacy robbery, another robbery conviction in 1971, and an attempted second degree burglary conviction in 1975.

*Penalty Phase Evidence*

The three felony convictions introduced to impeach defendant's guilt phase testimony, as well as a felony assault conviction arising from the 1979 Koll robbery incident, were also introduced at the penalty phase. In taking notice of the 1984 robbery conviction, the court also took notice that the personal firearm use allegation in that case was found not true.

The underlying facts of the 1971 robbery conviction and the 1979 Koll-incident assault were proven. In a 1970 robbery, defendant and another man held up a Fresno motel at gunpoint, taking money from the till as well as from the night clerk's wallet. Defendant, who did not display a gun, cut the clerk with a knife. In the 1979 incident, the preliminary hearing testimony of Edwin Dillhoffer, who had died by the time of trial, was read. Dillhoffer was in the lobby outside Koll's pharmacy. A large man jumped over the pharmacy counter and hit him in the head with what appeared to be a black sock. He was immediately followed by a smaller man, who knocked Dillhoffer down, breaking his hip.

Evidence was also introduced of an unadjudicated 1980 incident of violence. Leroy Smith testified that after defendant's sister had an argument with Smith's daughter, defendant left in his car, going to another sister's house. Smith followed in his own car. Smith parked in the driveway and started to get out of his car, but defendant started shooting a handgun in his direction. Smith got back in the car, took cover behind the dashboard, and backed out. He was not injured, but several shots hit his car.

The defense introduced no evidence at the penalty phase.

DISCUSSION

*Guilt Phase Issues*

I. *Sufficiency of the Evidence*

■ Defendant contends the evidence at trial was insufficient to justify his conviction for Koll's murder and that his conviction therefore violated the due process clause of the Fourteenth Amendment to the United States Constitution.

■ The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [99 S.Ct. 2781, 2788-2790, 61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) " '[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 461, 760 P.2d 996].) 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

■ The evidence, though circumstantial, amply supported defendant's conviction for murder. Koll was killed in a deliberate manner, suggesting execution, not a robbery attempt, indicating his assailant had strong preexisting reasons for wanting him dead. Defendant had such a motive, for Koll had been the only person to identify him as a robber of the pharmacy at the preliminary examination. The only other person who the evidence showed had a motive to kill Koll, James Phillips, was at an all-day family funeral on the day of the killing. Defendant had no corroborated alibi for the time of the killing, and there was sufficient time during the noon recess for defendant to have driven from the supermarket parking lot to the pharmacy, shot Koll, and driven to his apartment and back to the supermarket lot. According to prosecution witnesses, defendant appeared unsurprised when told of Koll's

death shortly after it happened and demanded an opportunity to use the washroom before taking a gunshot residue test.

The killer hid his face behind a blue motorcycle helmet with a smoky bubble shield, both items defendant had owned and used in the recent past. While fleeing the scene, the killer was seen to hold one hand to the helmet as if to keep it on. Shortly after the crime, a smoky bubble shield with defendant's fingerprint on it was found in the street, along a route lying generally between the pharmacy and defendant's apartment. In addition to defendant's fingerprint, the bubble shield was linked to defendant through evidence that he had painted his helmet blue and that paint found on the snaps of the shield was the same color as, and in some physical respects similar to, paint found on a metal post near where defendant had painted the helmet.

Although the .38-caliber revolver with which Koll was killed was not found, defendant possessed .38-caliber ammunition, suggesting he owned or had access to a handgun that could fire such ammunition. Perhaps most damning, the telephone number of Koll's pharmacy was written in defendant's spiral-bound notebook. Although defendant denied having written it, a prosecution handwriting expert found good indications he had, and the defense offered no other explanation for the number's presence in the notebook.

Defendant notes that he and his attorney in the robbery case, Lara, testified that Koll's identification of him as one of the robbers was vulnerable to challenge at trial; he argues the evidence of motive was therefore insufficient. Nonetheless Koll *did* identify him at the preliminary examination and was the only witness to do so. The jury could reasonably conclude that defendant did not want to take the risk that Koll's identification would be credible to a jury. Similarly, defendant emphasizes that his fingerprints were not found at the scene of the crime and that he offered an explanation for his fingerprint on the bubble shield. But the jury was not obliged to believe that explanation and could reasonably have concluded that the bubble shield belonged to defendant. Along the same lines, the evidence was in conflict as to whether defendant was present when Prosecutor Haney told Defense Attorney Lara that Koll had been killed, giving Haney an opportunity to observe defendant's lack of a visible reaction. The jury, again, could reasonably credit Haney's recollection of this event over Lara's and defendant's. This court cannot reweigh such questions of credibility.

The two cases defendant cites as similar to his, *People v. Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719] and *People v. Blakeslee*

(1969) 2 Cal.App.3d 831 [82 Cal.Rptr. 839], are readily distinguishable. In *People v. Trevino*, there was no evidence of a motive for murder on the part of the defendant (Rivas), who was a friend of the victim; the conviction rested entirely on an equivocal eyewitness identification and a fingerprint from the defendant in the victim's apartment, where he had previously been a guest. (*Trevino, supra,* at pp. 676, 696-697.) Here, the evidence of motive was strong, there was no innocent explanation for the presence of the pharmacy telephone number in defendant's notebook, and defendant's explanation of his fingerprint on the bubble shield was contradicted by several prosecution witnesses.

In *People v. Blakeslee*, the evidence established only that the defendant and her brother had both quarreled with the victim, who was their mother (the brother having done so on the night of the killing), that both had access to a rifle (belonging to the brother), and that the defendant had offered police a false account of her movements (intended, she testified, to protect the brother). The evidence was thus at least as consistent with the brother's guilt as with the defendant's. (*Blakeslee, supra,* 2 Cal.App.3d at pp. 837-840.) Here, defendant had a virtually unique combination of motive and opportunity to kill Koll and was connected by other circumstantial evidence (the notebook and fingerprint, and ownership of a blue helmet and smoky bubble shield) to the crime.

A reasonable jury could find beyond a reasonable doubt that the circumstantial evidence proved defendant's guilt.

## II. *Defendant's Faretta Motion*

On April 18, 1988, defendant moved to relieve his appointed attorneys, Halvor Miller and H. Clay Jacke, and represent himself. On April 22, before the court ruled on the motion, defendant withdrew it. Defendant now maintains the withdrawal was ineffective because it was motivated by confusion over whether the court was willing to appoint one of his current attorneys as advisory counsel and by counsel's unfulfilled promise to try to get him cocounsel status. He contends he was thereby deprived of his right of self-representation under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562].

Defendant first moved for self-representation on April 18, 1988, but the request was put over to April 21. At a hearing on that day, defendant explained that although he wanted to proceed in propria persona, he wished to keep Attorney Jacke as advisory counsel. The court indicated that if it relieved Miller and Jacke, it was unlikely to appoint either as advisory

counsel. The court stated it was "not reasonable to be relieved, the attorneys, then have him come back as advisory counsel." If advisory counsel were needed, the court would decide whom to appoint, and "[i]t may or may not include these two attorneys." The matter was continued to the next morning.

On April 22, the court stated, inconsistently with the previous day's record of proceedings, that it had told defendant the previous day that "in the event that he represented himself and he wished advisory counsel, that I would appoint advisory counsel and it would be between Mr. Jacke and Mr. Miller. It was up to him to decide." The court, however, noted it was unlikely to reappoint them if, at a later time, defendant decided he again wanted an attorney. Defendant thanked the court for "making it clear to me what its intentions were," but stated he now "would like to withdraw the motion to proceed in pro per." A short time later, the court again assured defendant that if he did represent himself and wanted advisory counsel, the court would appoint Jacke or Miller as such. The court would not, however, reappoint Jacke and Miller as defendant's attorneys. Defendant said he understood, though the court's intentions regarding advisory counsel appeared different than on the previous day. Defendant continued, "nevertheless, my feeling is the court has determined it would not appoint Mr. Jacke or Mr. Miller as my attorney. That's when I decided not to continue with pro per status."

The record makes plain that defendant's decision to withdraw his *Faretta* motion was not the product of confusion regarding the court's willingness to appoint Jacke as advisory counsel. Though on April 21 the court had suggested such an appointment was unlikely, on April 22 the court twice expressly stated that if defendant represented himself he could choose either Jacke or Miller as advisory counsel. Defendant twice indicated that he understood the court, but nonetheless wished to withdraw the motion. It was the court's unambiguously expressed unwillingness to consider future reappointment of Jacke and Miller as defendant's attorneys should he desire to terminate his self-representation, rather than its intentions regarding advisory counsel, to which defendant alluded in explaining his decision not to seek in propria persona status.

In withdrawing his motion, defendant also noted that he understood from counsel that the court had indicated it was amenable, as an alternative to self-representation, to "providing [him] some material to help prepare the case." The court agreed that appointed counsel could obtain "certain law textbooks" and other unspecified materials and that the court, or the department that had appointed counsel, could make an order allowing defendant to have such materials. Counsel subsequently sought, and in part received, permission from the court for defendant to have law library access and to keep research materials and a typewriter in his jail cell.

Later—after the *Faretta* motion was withdrawn—defendant said that, in addition, he "was under the impression that I was entitled to some type of legal status considering I was a sentenced prisoner . . . ." The court observed that he was a state prisoner only as to his robbery conviction, since the murder conviction had been reversed and was to be retried. This issue was not resolved; the discussion ended with defense counsel stating they would "file the appropriate motion at the appropriate time." It appears no motion for special legal status was filed.

Defendant claims the withdrawal of his *Faretta* motion was invalid because it was induced in part by counsel's misrepresentation. We disagree. The record shows defendant twice stated he wished to withdraw his motion *before* counsel indicated they would file a motion regarding prisoner status. Defendant in no way indicated that he intended to condition the withdrawal on obtaining such status, and the record does not reflect any attempt to renew his *Faretta* motion when counsel failed to file a motion. Defendant may have been satisfied with the order allowing him access to research materials, or he may have become convinced that he was not entitled to state prisoner status because his conviction had been reversed. There is thus no indication in the record that the possibility of such status induced defendant to withdraw his request for self-representation.

### III. *Denial of Defense Continuance Requests*

█ Defendant contends the trial court's denial of defense requests for continuances prior to and during trial deprived him of the effective assistance of counsel (in violation of the Sixth Amendment to the United States Constitution), a fair and reliable penalty verdict (Eighth Amendment), and a fair trial (Fourteenth Amendment). We disagree. Continuances in criminal cases may only be granted for good cause. (§ 1050, subd. (e).) While a trial court may not exercise its discretion over continuances so as to deprive the defendant or his attorneys of a reasonable opportunity to prepare (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1107 [31 Cal.Rptr.2d 321, 875 P.2d 36]), the court's rulings in this case had no such effect.

Defendant complains of the trial court's treatment of defense motions for continuance on four occasions before, during and after trial. We consider each occasion separately.

### A. *Pretrial continuance denied March 27, 1990*

This court's remittitur, upon reversal of defendant's first conviction, was filed in the superior court on January 26, 1988, and the matter was placed on

calendar for March 7, 1988. On that date, the court reappointed Halvor Miller and Elizabeth Harris, defendant's attorneys in the first trial, to represent him on retrial. The case was continued to March 30 for pretrial conference. On March 30, Ms. Harris was relieved, and H. Clay Jacke was appointed as Miller's cocounsel. The next day, at defense request, the case was continued to April 18 for further pretrial proceedings.

On April 18, 1988, the parties made their first appearance before the Honorable Jack B. Tso, who would be the trial judge. Judge Tso indicated he was in trial on another capital case and would not be available until the end of May. Defendant made his *Faretta* motion, which was withdrawn on April 22 as discussed *ante*, in part II., and, with the agreement of both parties, the court set a pretrial conference date of June 24. On June 10, June 24, July 22, August 19, and September 9, 1988, various defense motions were made and heard. On September 9, the court denied defendant's motion to recuse the district attorney's office and, with the agreement of both parties, set a further pretrial/trial setting conference for December 13, 1988, anticipating that jury voir dire would begin early in January 1989.

On November 29, 1988, the defense made a written motion for continuance, asserting that counsel needed more time for factual investigation. At the hearing on December 13, Attorney Miller asked for a March 24, 1989, date, which he thought "would be ample time" to complete the defense preparation. With agreement of both parties, the court set a readiness conference date of March 1, 1989, which, with a 20-day time waiver, would mean beginning jury selection on March 21.

On March 1, 1989, defendant moved for a further continuance, asserting that Attorneys Miller and Jacke expected to be engaged in other trials through April and June, respectively. Miller suggested July 28 as a trial date. Although disturbed that counsel had allowed other trial commitments to interfere with the agreed date for trial in this case, the court granted the continuance to July 10, 1989, with a 10-day time waiver. The court ordered defense counsel not to become engaged in any other proceedings that would interfere with this trial.

On May 26, 1989, the court held a status conference. The prosecutor stated that the People would be ready to begin trial proceedings on July 10, the date previously set. Defense Attorney Miller, however, stated the defense would not be ready because (1) the guilt phase investigation was not complete, (2) the penalty phase investigation had not been started, (3) Cocounsel Jacke was "continuously engaged" in other trials and had been unable to assist, and (4) Miller and Jacke had planned a joint vacation (at a

legal conference in China) for late August through early September. Jacke said he was representing a defendant in the "Ninja murder case" who would not waive time; he did not expect to finish that trial until late November 1989. The court suggested that Jacke consider resigning as counsel and that Miller consider obtaining new cocounsel. The court ordered counsel back for a trial setting conference on June 28.

On June 28, 1989, Miller stated he was still not ready because Jacke had been unable to help with trial preparation. Jacke not being present, the matter was put over to June 30. On that date, Jacke again explained that he had unexpectedly had to go to trial in another case, which he expected to be finished by November. Miller suggested a "firm date" for trial would be sometime in January 1990, and Jacke suggested the court hold a trial setting conference in November 1989. The court granted the continuance, setting a date of November 17, 1989, for the trial setting conference. Counsel were ordered not to become engaged in any other trials after November 17.

On November 17, 1989, the court filed and read a letter from defendant complaining of the delay in beginning his retrial and indicating that another attorney might be willing to take over for Jacke. Both attorneys then asked to be relieved of their appointments, though Miller indicated he could begin trial in four or five months with the prospective new cocounsel, Charles Maple. Jacke explained that he would not be done trying his current capital case until February or March of 1990. The court relieved Jacke, agreed to Maple's appointment, and continued the matter to February 27, 1990. Miller was ordered not to become engaged in any other case.

On February 27, 1990, the court pushed counsel to begin trial in March. Miller protested that he had a conflict with another case (*People v. Louis*) in which he was also being ordered to trial, and that he could not be ready to try Snow's case by March 13. Cocounsel Maple suggested March 27 or March 30. The court set trial to begin with jury selection on March 27 and ordered the clerk to notify the jury commissioner that the court would need 100 potential jurors on March 27.

On March 13, 1990, Miller moved for a continuance, asserting that he and Maple needed additional time to prepare for trial. On the same day, he filed letters to Judge Tso and to the Honorable Judith Chirlin, also of the Los Angeles County Superior Court, the trial judge in *People v. Louis*, complaining that because of "competing orders" in the two cases he was being forced to try to prepare both at once. On March 21, Maple filed a continuance motion, asserting that more time was needed because the prosecution apparently had some photographs, taken in connection with the paint analysis, that

had not been provided to the defense, and because the defense wished to conduct its own analysis of the paint samples.

On March 23, 1990, the court observed that Judge Chirlin had continued her capital case, so Miller was available to try the Snow case. The court also ordered the prosecution to give defense counsel access to any "lab photos and results."

On March 27, 1990, the date set for trial, Miller announced "not ready." He declined the court's invitation to elaborate on his claim that he needed more time for preparation. The court denied Miller's motion, ruling that the "blanket statements" in Miller's written motion as to the need for further preparation time were inadequate to justify a further continuance. After eliciting the prosecutor's assurance that all paint photographs in his possession had been given to the defense and that the defense could contact the prosecution expert to determine if there were more photographs, the court also denied Maple's motion; the court observed that the defense could continue its investigation of the paint samples, as to which the court would appoint an expert if the defense desired, and that if necessary a short continuance in connection with the expert analysis would be considered.

We conclude the denial of continuance motions on March 27, 1990, was not an abuse of the court's discretion, good cause for the requested continuance not having been shown (§ 1050, subd. (e)), nor did it deprive counsel of a reasonable opportunity to prepare the defense. On that date the case had been pending in the superior court for 26 months. The court had already granted numerous and lengthy continuances at defense request. Defendant had repeatedly waived his right to a speedy trial, but had also expressed frustration at counsel's continual need for continuances.

Attorney Miller, who had previously defended defendant on these same charges, had been reappointed over two years before, on March 7, 1988. Miller had previously stated that he expected to be ready for trial in March 1989 and again in July 1989. In November 1989, he stated that he could be ready with new cocounsel, Maple, in March or April 1990. The court did not abuse its discretion in failing to credit Miller's bare assertion, which he declined to explain further, that he needed more preparation time.

Attorney Maple was more recently appointed, but had had several months to acquaint himself with the evidence. Maple did not indicate that he was personally unprepared for trial; rather, his motion rested on the assertion that the paint samples, of which the prosecution had obtained an expert comparison analysis, and related photographs, had not yet been made fully available

to the defense. The court ordered all results and photographs produced; indicated it would, if desired, appoint a defense expert to analyze the samples; and would consider a request for a short continuance on these grounds if and when the issue arose. In the absence of concrete information as to the length of time a defense expert analysis would take, the court did not abuse its discretion in beginning the lengthy capital jury selection process on March 27.

Defendant cites *Little v. Superior Court* (1980) 110 Cal.App.3d 667 [168 Cal.Rptr. 72] for the proposition that a trial court may not lawfully require counsel to proceed to trial unprepared. In *Little*, the deputy public defender assigned to represent the defendant was unable to appear at the preliminary hearing because of a calendaring error. (*Id.* at p. 670.) A supervising deputy appeared, explained the problem, and moved for a continuance. The prosecutor, who had witnesses summoned for that date, objected, and the court denied the continuance despite the supervisor's representation that he had never talked to the defendant and was completely unfamiliar with the case. (*Ibid.*) *Little* is obviously not on point; defendant here began trial with two attorneys, one of whom had defended him before on the same charges and had been reappointed more than two years earlier, the other of whom had been appointed four months earlier.

Nor does *Hughes v. Superior Court* (1980) 106 Cal.App.3d 1 [164 Cal.Rptr. 721], upon which defendant also relies, support his position. In *Hughes*, the appellate court overturned a contempt order made against a defense attorney who refused to participate in a trial for which he was unprepared. The attorney, a deputy public defender, had been assigned to two cases set for trial on the same Monday. He guessed incorrectly which trial would actually go forward, used the weekend to prepare that case, and then was denied a continuance on the other, unprepared case. (*Id.* at p. 3.) The limited record before the appellate court did not indicate why he had announced ready on both cases when he was not prepared on one of them; nor, as far as the appellate opinion reflects, did it indicate whether he had had a significant period of time *prior* to the weekend before trial in order to prepare. (See *id.* at pp. 5-6.) In the present case, Attorney Miller had more than two years to prepare to represent defendant. He had repeatedly been warned not to take on other trial obligations and was not in fact forced to trial in two cases simultaneously; rather, he was granted continuances in the *Louis* case, which freed him to finish preparation for, and go to trial on, defendant's case. The trial court was not obliged to credit his claim that because he did not know which case was actually going to trial he could not prepare either. The court did not abuse its discretion, or deny Miller a reasonable opportunity to prepare for trial, in refusing to grant an additional continuance on March 27, 1990.

## B. *Trial continuance denied April 19, 1990*

On April 19, 1990, during jury selection, defense counsel moved orally for a continuance, asserting they needed 45 to 60 days to finish the expert paint comparison work. In an in camera hearing, counsel asserted that the prosecution expert who had previously compared the bubble shield and post paints, Stephan Schliebe, had been uncooperative as to providing his data and samples to the defense and that, once the defense had these materials, their own examination would take up to 30 days.[2] The court suggested Schliebe be subpoenaed to appear the next day in order that the court could order him to produce any needed materials. The court further indicated that it considered excessive the defense estimate of time needed to complete the expert examination and that no continuance would be granted on that basis. After the conclusion of this confidential hearing, defense counsel stated that they intended to seek writ relief in the Court of Appeal.[3]

Later that day, as voir dire was completed and the court prepared to swear in the jury, defense counsel moved to defer swearing the jury until the defense writ petition was heard. The court denied that motion. The court also denied a *prosecution* request for a three-day continuance to "get my witnesses and coordinate the evidence," noting that "you've had two years to be able to get them."[4]

The court did not, by these rulings, abuse its discretion or deprive the defense of a reasonable opportunity to prepare. Counsel's bare assertion that they would need 30, 45, or 60 days to complete their examination of the paint samples did not constitute good cause for such a lengthy continuance, especially as the prosecution had not even begun to present its own case. Nor does the record indicate the defense was actually prejudiced by the denial of a lengthy continuance for examination of the paint materials.[5] Nor, finally, has defendant even attempted to demonstrate he was prejudiced by the trial court's swearing in the jury panel before his writ petition was heard and decided.

---

[2] The transcript of this hearing was originally filed under seal. Both parties having received notice, and neither having objected, the transcript is hereby ordered unsealed. (Cal. Rules of Court, rule 12.5(f)(2).)

[3] The Court of Appeal summarily denied the petition on April 23, 1990. This court denied review on May 7, 1990.

[4] Defendant incorrectly states that this request for a three-day continuance was made by the defense.

[5] When, on Tuesday, May 8, 1990, the prosecution called its expert, Schliebe, Defense Counsel Maple protested that the defense had not yet completed its examination and was therefore unprepared to cross-examine Schliebe. At the court's suggestion, Schliebe's testimony was postponed to Monday, May 14. Maple agreed that was satisfactory, noting that the defense evaluation of the evidence would be complete by then.

### C. *Trial continuance granted June 12, 1990*

The jury returned its guilt verdict and special circumstance finding on June 4, 1990. On request of defense counsel, the court ordered the penalty trial to begin on June 12. On June 11, however, Attorney Miller filed a continuance motion asserting that counsel needed additional time for penalty investigation and consultation. At a hearing on June 12, Miller estimated they needed 30 to 45 days to complete their investigation. Despite its "astonish[ment]" that counsel, having previously represented defendant in a penalty trial and having been reappointed for more than two years, was still unprepared, the court granted the motion for continuance, setting July 17 for the start of the penalty trial.

The penalty trial began on July 17, 1990, with presentation of the People's opening statement and evidence. After the prosecution rested, the defense also rested without giving a statement or presenting any evidence. Defense counsel did not at either time seek an additional continuance or assert they were unprepared for the penalty trial. But on appeal, apparently claiming he should have received a *longer* continuance before the penalty phase, defendant attributes his trial attorneys' inaction during the penalty phase to the court's earlier denials of continuances for trial preparation.

We must reject this contention as completely unsupported by the record. In addition to the more than two years Counsel Miller had already represented defendant, the defense was given 42 days (from June 5 to July 17) after the close of the guilt trial to prepare for the penalty trial. That time included a continuance requested by the defense and *granted* by the court. At the penalty trial, counsel did not request more time, nor did counsel claim that their failure to call any penalty witnesses or present other mitigating evidence was due to lack of preparation. There is thus no basis for the claim that the court's earlier denial of continuances deprived counsel of a reasonable opportunity to prepare for the penalty phase.

### D. *Posttrial continuances denied September 21 and 25, 1990*

The jury returned its penalty verdict on July 19, 1990. The court indicated it would set August 16, 1990, as the date for hearing the automatic motion for modification of verdict and for sentencing, but at the request of defense counsel set those matters instead for August 23, a week later.

On August 10, 1990, asserting that the defense needed additional time to prepare a motion for new trial based on the discovery of new evidence, Defense Counsel Miller filed a motion for continuance of the sentencing and

modification hearing. On August 23, the court *granted* that motion, setting a new date of September 21.

On September 20, Miller again filed a motion for continuance, again asserting, without particulars, that more time was needed to investigate newly discovered evidence. On September 21, the court denied the motion for failure to give two days' notice and for lack of specific facts showing good cause. Because Miller was absent due to a fire in his office building, however, sentencing and the modification motion were continued to September 24.

On September 24, however, Miller was again absent, this time because of a family emergency. Attorney Maple declared himself unprepared to make the motion for new trial. The court put the matter over to the next day.

On September 25, Maple renewed the earlier continuance motion. Maple explained that in order to corroborate the defense theory of a police conspiracy to frame defendant (apparently by getting his fingerprint on a bubble shield similar to that worn by the killer), the defense had been seeking, but had had difficulty obtaining, Pasadena Police Department reports and hospital records relating to automobile accidents discussed on a police dispatch tape. These reports and records would, the defense hoped, show the true origin of the bubble shield introduced at trial. The court again denied the continuance.

We conclude the court's ruling did not deprive the defense of a reasonable opportunity to prepare a new trial motion. As the prosecutor noted in opposing the continuance, the defense theory of a police scheme to plant evidence against defendant was of long standing (see *People v. Snow, supra,* 44 Cal.3d at p. 220), and counsel failed to explain why the records now under investigation had not been investigated in preparation for defendant's first trial or in the two and one-half years since Miller was reappointed to defend defendant in the retrial. Nor did counsel's explanation demonstrate that a continuance was likely to be useful (see *People v. Frye* (1998) 18 Cal.4th 894, 1013 [77 Cal.Rptr.2d 25, 959 P.2d 183]); it was far from clear, that is, that a reasonable continuance would allow the defense to obtain records tending to show that the police officers' testimony about finding the bubble shield was false and that the shield actually had been obtained from some accident scene. There was no good cause to continue the modification and sentencing hearing.

IV. *Appearance of Judicial Bias*

 Defendant contends that the trial court's hostile and disparaging comments during trial exhibited such a degree of bias against defense

counsel, and so interfered with counsel's examination of witnesses, as to deprive defendant of a fair trial, the effective assistance of counsel, and a reliable penalty determination. We disagree. First, because counsel failed to object to, or seek a jury admonition regarding, any of the instances of alleged judicial intemperance, the issue is waived on appeal. (*People v. Fudge, supra*, 7 Cal.4th at p. 1108; *People v. Wright* (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221].) Moreover, the claim is without merit; though the trial judge, the Honorable Jack B. Tso, was sometimes impatient with the attorneys for both parties, and though a few of his exchanges with defense counsel were especially contentious, neither separately nor together do these instances of harsh language amount to an unconstitutional display of judicial bias.

■ Although the trial court has both the duty and the discretion to control the conduct of the trial (*People v. Fudge, supra*, 7 Cal.4th at p. 1108), the court "commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" (*People v. Carpenter* (1997) 15 Cal.4th 312, 353 [63 Cal.Rptr.2d 1, 935 P.2d 708]). Nevertheless, "[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior." (*U.S. v. Donato* (D.C. Cir. 1996) 99 F.3d 426, 434.) Indeed, "[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." (*United States v. Pisani* (2d Cir. 1985) 773 F.2d 397, 402.)

■ Defendant cites several minor instances assertedly showing the court's impatience with, or irritation toward, counsel.[6] But such manifestations of friction between court and counsel, while not desirable, are virtually

---

[6]Some examples: During voir dire, defense counsel made an innocuous, offhand comment to the prospective juror. The court·said: "Mr. Maple, let's not go into that. Your next question, please." Also during voir dire, the court asked Maple the relevance of one of his questions, then, before he could answer, said, "Let's go on to another subject matter." The court interrupted defense counsel's cross-examination of a police officer, warning, "Don't argue. Ask your question, please. Don't argue with the witness." When counsel, cross-examining another prosecution witness, twice asked about the contents of the witness's conversation with the victim on the day of the killing, the court admonished counsel, "That is covered already. You said that day. It's been asked and answered. Your next question, please." During Defense Counsel Maple's examination of a defense witness, the court asked the lead attorney,

inevitable in a long trial. The trial court frequently addressed the prosecutors in an equally brusque manner.[7]

Defendant maintains the court "frequently disparaged and upbraided defense counsel" during counsel's examination of witnesses. Upon examination, we conclude that, whether or not the court's evidentiary ruling in each cited instance was correct,[8] in no case did the court display overt bias against the defense so as to deprive defendant of a fair trial. In asking defense counsel whether a line of questioning, on recross-examination of the prosecution fingerprint examiner, was within the scope of redirect, the court neither disparaged counsel's efforts nor prevented counsel from pursuing cross-examination. Similarly, when the court told counsel not to "argue" with a police investigator, defense counsel rephrased and re-posed his question without objection or court interference. Again, when the court interrupted counsel's cross-examination of a prosecution witness who had heard the gunshots, urging counsel to "get right to the issue," counsel complied but eventually returned to the interrupted line of questioning. Whether or not the court's rulings on cross-examination of Stephan Schliebe, the prosecution paint expert, were correct (see *post*, pt. VII.), the court, contrary to defendant's claim, did not "berate" counsel in making them. Counsel's cross-examination was extensive, technical, and at points confusing, and the court's occasional impatience with repetitious or vague foundational questions did not convey a judicial bias against the defense.

Miller, whether he wanted to take over the examination, noting, "We've been on this witness for almost 34 minutes."

Defendant lists several more examples, which may pass without individual comment. Also not requiring comment, because they do not support defendant's contention that the court displayed bias to the jury, are remarks the court made outside the jury's presence.

[7]For example, the court interrupted Prosecutor Holliman's examination of a witness to warn, "Don't testify. She's already testified to that. Don't repeat oneself." The court rephrased Holliman's question to another witness, asking rhetorically, "Why don't we have the witness testify rather than the attorneys?" The court instructed Prosecutor Lutes, "First of all, lay a foundation so the jury knows what we are talking about." When the court sustained a defense objection to one of Holliman's questions, he asked to approach the bench; the court refused, saying only, "There is no need to approach. You may continue." During defense examination of a witness, Prosecutor Lutes asked for clarification of an evidentiary ruling. The court responded simply, "You will interpose objections at the proper time. I will rule upon the objections." When Lutes then tried to state an objection, the court cut him off, saying, "There is no question pending." When Lutes began a question to an expert witness with, "Now, my background isn't in chemistry . . . ," the court interrupted to warn, "Let's not have any prefaces, please." When Lutes asked a witness to read a newspaper article on the stand, the court admonished him, "Counsel, why didn't you have this witness read the article out of the presence of the court and jury? This is consumption of court time. It's not necessary."

[8]Claims of error in the court's rulings on objections during defense examination of witnesses are made in defendant's claims VI and VII and are discussed *post*, in parts VI. and VII.

On redirect examination of Adolfo Lara, defendant's attorney in the robbery trial, confusion arose over two aspects of the prosecutor's cross-examination: On cross, Lara had been confronted with prior testimony in which he described his reaction to the news of Koll's death as "disbelief," and had also been denied an opportunity to explain why, once he was convinced Koll really had been killed, he was not "shocked." On redirect, defense counsel attempted to read additional prior testimony going to the question of what Lara meant by "disbelief." The court, apparently misrecalling the cross-examination, thought Lara had wanted to explain his "disbelief" but had been denied that opportunity; the court told defense counsel, instead of reading the testimony, simply to ask Lara what he meant by "disbelief." Lara then eliminated the source of the confusion by testifying that he was using "shock" and "disbelief" in the same sense, i.e., to convey that when the robbery prosecutor, Haney, told him Koll had been killed, Lara at first thought Haney was either joking or testing his reaction. The court's repeated direction that counsel ask Lara what he meant rather than read his prior testimony betrayed judicial confusion—which was soon dispelled by Lara's testimony—rather than bias.

Defendant complains of the court's treatment of counsel during the direct examination of Ramesh Kar, the defense's paint comparison expert. Kar's testimony begins on page 4306 of the reporter's transcript. Not until page 4394 did defense counsel ask Kar to give his opinion as to whether the paints on the metal post and bubble shield matched each other. Part of the intervening testimony involved the effect of "Bremstrahlung radiation" on electron microscopy of materials. Kar testified that the examiner must adjust for the Bremstrahlung effect, which can mask the presence of certain elements and create spurious indications of other elements. When counsel further asked Kar to "illustrate" the Bremstrahlung effect using a projected graph, the court barred the illustration on its own motion, saying, "I don't need it illustrated. The jury doesn't require it. Let's get the matters that are relevant."

Kar then testified that the prosecution's paint comparison expert had apparently *not* adjusted for the Bremstrahlung effect. When counsel asked Kar if the prosecution examiner's unadjusted data would lead Kar to the same conclusion he had independently reached about the materials, the court objected that counsel was assuming facts not in evidence: no conclusion about the materials had yet been elicited from Kar. The court told counsel, "Now, I don't know what his conclusion pertains to, so why don't we get to it, counsel, please." As defense counsel began to lay the foundation for Kar's opinion, however, the court periodically interposed, or solicited from the prosecutor, objections to the phrasing of certain questions. After the court

again urged counsel to get to "the bottom line," the following exchange occurred:

"Q. By Mr. Maple: Do you have an opinion, Dr. Kar, as to whether the paint taken from the—

"The Court: By whom?

"Q. By Mr. Maple: —snap ring of the bubble shield—

"The Court: That he took, right? Not the one that Schliebe took; is that correct?

"Mr. Maple: That is right. Because nobody can test that, your Honor. He [Schliebe] threw it away."

"Mr. Holliman: I'll object to counsel editorializing.

"The Court: Disregard the statement of the attorney. Counsel, I cautioned you. Let's not have any of this. All I'm trying to do is to speed up the process because we have an expert here that can give us his opinion, and the standard way of doing it is to qualify the expert; ask him what his opinion is as to the—whatever he's going to compare. Then he'll give his opinion and then simply ask him what the basis of his opinion is, at which time he may then bring in focus all of his qualifications for all of us. But you're shot gunning, counsel. That—

"Mr. Maple: Well, your Honor and I differ, and I apologize to the court for the difference.

"The Court: Counsel, I told you how much this court costs to operate."

Counsel then elicited Kar's opinion (that the paints differed) without further difficulty.

While some of the court's comments during the examination of Kar "would have been better left unsaid" (*United States v. Pisani, supra,* 773 F.2d at p. 402), we do not believe the court's behavior "was so prejudicial that it denied [defendant] a fair, as opposed to a perfect, trial." (*Ibid.*) That the court became impatient with counsel's examination of the expert was per-haps understandable, but its instructions on how to question the witness should have been given outside the jury's hearing. Nonetheless, we believe the effect of the court's remarks was not to "discredit the defense or create the impression it is allying itself with the prosecution." (*People v. Carpenter,*

*supra,* 15 Cal.4th at p. 353.) The jury may well have received the impression that the court disliked counsel's methods of examination, but not that the court disparaged or discredited Kar's favorable evidence itself.

Finally, defendant claims that the court undermined the credibility of an expert witness the defense attempted to call to testify regarding eyewitness identification evidence.[9] However, as this expert's proposed testimony was excluded as irrelevant (see *post,* pt. X.), how defendant could have been prejudiced by any damage to her credibility is unclear.

We conclude that imperfect as the trial court's behavior may occasionally have been, it did not deprive defendant of a fair trial, the effective assistance of counsel, or a reliable penalty determination.

### V. *Restriction on Jury Voir Dire*

■ Defendant cites four instances in which the court assertedly restricted jury voir dire.[10] In only one of these cases, however, does the record show the court actually cut short the defense attorney's questioning on a topic. During the general voir dire of Prospective Juror N., the defense questioned her in some detail about the murder of two of her cousins, which occurred in 1958 when N. was 19 years old. N. stated that the killer had been apprehended, had been found not guilty by reason of insanity and confined in a psychiatric hospital. The following exchange ensued:

"Mr. Maple: All right. Had he been in some sort of relationship with your cousins?

"Prospective Juror N.: They were all mutually investing in—

"The Court: Just a moment. What is the relevance of this, counsel?

"Mr. Maple: Well—

"The Court: Let's go on to another subject matter."

Maple then asked the prospective juror whether knowing what happened to her cousins would affect her ability to judge this case fairly. She replied in the negative.

---

[9]When the witness stated she had done research supported by the Michael Milkin Foundation, the court observed that Milkin had pled guilty to "fraud and mischief with the security exchange people." When the witness, who had been appointed by another judge of the court, testified she would receive $1,000 per day to testify, Judge Tso expressed surprise and disapproval.

[10]All four instances were also cited as examples of biased conduct by the court. (See *ante,* pt. IV.)

Defendant contends it was error to cut off defense counsel's line of questioning, which assertedly might have revealed similarities between the murder of N.'s cousins and the present case. Perhaps, defendant suggests, N. would have answered "by saying that the cousins were murdered to prevent them from testifying against the murderer." But N.'s *actual* answers—that the killer and victims had been in business together and the killer was found to be insane at the time—do not suggest any particular similarity to the present case. Given the remoteness in time of the cousins' killing (32 years before this trial) and the lack of any apparent close similarity, we conclude the court's exercise of discretion to expedite the examination (*People v. Wright, supra,* 52 Cal.3d at p. 419) did not affect defendant's right to a fair and impartial jury (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659]) or the reliability of the penalty verdict.

### VI. *Cross-examination of Gladys Koll*

██ Defendant claims he was denied his rights of confrontation and effective assistance of counsel, his right to a reliable death verdict, and his right to present a defense by the court's ruling sustaining a relevance objection to defense counsel's question of the victim's wife, Gladys Koll, regarding the contents of the pharmacy safe.

Gladys Koll testified that after her husband's death she checked the pharmacy inventory and records and found that no controlled narcotics, which were kept in the safe, were missing, and that the safe "hadn't been disturbed." On cross-examination, defense counsel asked Mrs. Koll, "What kinds of narcotic items were kept in the safe?" The court sustained the prosecutor's relevance objection "because of the preliminary testimony by this witness that the safe was not disturbed."

Defendant argues counsel's question "directly pertained to the accuracy and completeness of the witness's knowledge about the narcotics" and thus the answer would have affected her credibility "about whether, indeed, the safe had been 'disturbed' in that respect." But Mrs. Koll had testified that she compared the contents of the safe with written inventory records, not with her own memory of the narcotics kept therein. Moreover, the trial here took place almost eight years after Koll was killed. Mrs. Koll's ability or inability, at that late date, to remember what particular drugs had been kept in the safe would not have had a tendency in reason to prove or disprove the accuracy of her inventory check. The relevance objection was therefore properly sustained (Evid. Code, § 210), and none of defendant's asserted rights under the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution were infringed.

## VII. *Cross-examination of Stephan Schliebe*

■ Defendant contends that two rulings during the cross-examination of Stephan Schliebe, the prosecution's paint comparison expert, deprived him of the rights of confrontation and effective assistance of counsel, his right to a reliable death verdict, and his right to present a defense.

In the first instance, Defense Counsel Maple was questioning Schliebe about his analysis of paint samples from the metal pole. This exchange followed:

"Q: Okay. Now, can you tell me, sir, what the percentage of the zinc is?

"A: No. I didn't do a quantitative analysis.

"Q: If you were to do a quantitative analysis, how would you do that, sir?

"The Court: Counsel, that's irrelevant at this stage. He didn't do it."

When Maple tried to explain the question's relevance, the court twice cut him off, saying, "Your next question."

According to defendant, the court's ruling "prevented the jury from fully evaluating the witness's overall expertise and his familiarity with the particular testing equipment which he used." Schliebe, however, was extensively cross-examined on those topics both before and after the complained of ruling. Defendant was not constitutionally entitled to ask the expert how a test the expert did not do would have been done had he done it; even the expert's confession of ignorance as to how such a test is done would not have discredited his data and conclusions as to the analyses he did perform. (See *People v. Bell* (1989) 49 Cal.3d 502, 531-532 [262 Cal.Rptr. 1, 778 P.2d 129] [expert may be cross-examined on the reasons for his opinion, and on certain relevant material that the expert failed to consider in reaching his opinion, but not on matters irrelevant to the import or credibility of his opinion].)

Second, defendant complains that the court interfered with counsel's effort to cross-examine Schliebe about his failure to account for the Bremsstrahlung effect in certain of his analyses. These parts of the cross-examination are very difficult to understand, partly because counsel himself confused the exhibits with one another, partly because counsel and the witness both sometimes referred to exhibits as "this" or "that" rather than by number or by reference to the source of the paint samples analyzed, but mainly because

counsel mixed inquiries about the Bremstrahlung effect with inquiries about apparent quantity differences in individual elements, such as zinc and iron, in the samples; as a consequence, the general subject of the examination became uncertain, and it was unclear which of counsel's technical questions were foundational and which called for conclusions.

The court may or may not have helped matters by interrupting, with various requests for clarification and admonitions to avoid repetition, counsel's apparent attempt to ask the expert whether the Bremstrahlung effect could have masked minor differences between blue paint taken from the bubble shield and that taken from the metal pole. Nevertheless, when the brush had been cleared and counsel was finally in a position to ask that question directly, he unaccountably abandoned the effort and instead asked Schliebe to "account for the difference in the iron or Fe&T." Counsel did, earlier on, get Schliebe to admit generally that the Bremstrahlung effect "may have" masked small amounts of elements in the "various paint samples." His failure to elicit more specific testimony regarding comparison of the two blue paint samples was not the fault of the trial court.

### VIII. *Motion to Recuse the District Attorney's Office*

Before trial, defendant moved to recuse the Los Angeles County District Attorney's Office as prosecutor, claiming that the expected receipt of testimony from two deputy district attorneys employed by that office, Gerald Haney and John Krayniak, made prosecution by the district attorney's office improper under section 1424. Haney was the deputy who prosecuted defendant on the Koll pharmacy robbery. Krayniak was, at the time of the killing, a Pasadena police officer involved with the investigation, but he had since joined the district attorney's office as a prosecutor.[11] Both ultimately did testify at trial.

Neither Haney nor Krayniak was claimed to be participating in the murder prosecution. Rather, defendant claimed that "the testimony of both these witnesses . . . is so subject to colored interpretation as to vitiate the defendant's rights to a fair trial . . . ." In argument on the motion, defense counsel claimed that because of the "camaraderie" in the district attorney's office the prosecutors "could not but have a zealous approach to this particular case beyond that ordinarily shown in an evenhanded manner in an ordinary case." The court denied the motion, finding the defense had not

---

[11]At trial (about two years after the recusal motion was heard), Krayniak testified he was employed as a deputy in the New Jersey Attorney General's Office. As the recusal motion was argued and decided on the premise that Krayniak was employed by the Los Angeles County District Attorney's Office, we will accept that premise for purposes of our discussion as well.

shown "that a conflict of interest in our present case would render it unlikely that the defendant would receive a fair trial."

We recently reiterated the applicable principles in *Hambarian v. Superior Court* (2002) 27 Cal.4th 826 [118 Cal.Rptr.2d 725, 44 P.3d 102] (*Hambarian*). "The standard for a motion to disqualify the prosecutor is set forth in Penal Code section 1424: 'The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' We detailed the history of this statute and the associated legal principles in [*People v. Eubanks* (1996) 14 Cal.4th 580 [59 Cal.Rptr.2d 200, 927 P.2d 310]], where we explained that a 'conflict,' for purposes of section 1424, ' "exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." ' (*Eubanks, supra,* 14 Cal.4th at p. 592, quoting *People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5].) However, 'the conflict is disabling only if it is "so grave as to render it unlikely that defendant will receive fair treatment" ' during all portions of the criminal proceedings. (*Eubanks, supra,* at p. 594.) The statute thus articulates a two-part test: '(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?' (*Ibid.*)" (*Hambarian, supra,* at p. 833, fn. omitted.)

Defendant argues the trial court applied the wrong standard: according to him, the court was called upon only "to determine whether there was a 'reasonable possibility' that the D.A.'s office might not exercise its discretionary function in an evenhanded manner." Defendant is clearly wrong: such a determination would satisfy only the first part of the two-part test outlined in *Eubanks* and *Hambarian*. The trial court correctly refused to recuse the district attorney's office without a showing that prosecution by that office would render fair treatment unlikely. (*Hambarian, supra,* 27 Cal.4th at p. 833.)[12]

As defendant does *not* contend the trial court's ruling was an abuse of discretion (see *People v. Eubanks, supra,* 14 Cal.4th at pp. 594-595) under what we have explained is the correct legal standard, we need not decide that question. We note, however, that recusal of an entire district attorney's office, especially a large one such as Los Angeles County's, has generally not been held required merely because one or more employees of that office

---

[12]Defendant also asserts that denial of the recusal motion deprived him of a fair trial (U.S. Const., 14th Amend.) and a reliable penalty determination (*id.,* 8th Amend.), as well as constituting error under section 1424. As defendant nowhere articulates how, if at all, the relevant constitutional principles differ from the statutory standard, we discuss only the legal standard set out in section 1424. (See *Hambarian, supra,* 27 Cal.4th at p. 833, fn. 4; *People v. Eubanks, supra,* 14 Cal.4th at p. 596, fn. 8.)

are witnesses in the case. (See *People v. Hernandez* (1991) 235 Cal.App.3d 674, 678 [286 Cal.Rptr. 652]; *Trujillo v. Superior Court* (1983) 148 Cal.App.3d 368, 370, 373 [196 Cal.Rptr. 4]; *People ex rel. Younger v. Superior Court* (1978) 86 Cal.App.3d 180, 191-192, 205-212 [150 Cal.Rptr. 156].)

### IX. *Admission of Assertedly Privileged Communication*

█ Defendant claims error in the admission, over defense objection, of evidence that defendant had asked to delay his response to the robbery plea bargain offer until after the lunch hour. Because the communication to his attorney of this request was privileged, he contends, its admission denied him due process and a fair trial.

Gerald Haney, the deputy district attorney who prosecuted defendant for the robbery of Koll's pharmacy, testified that on the morning of November 3, 1980, he and Adolfo Lara, defendant's attorney, were in plea negotiations in the trial judge's chambers. Haney made an offer, which Lara left to discuss with defendant. Over defense objection, Haney testified that when Lara returned he told Haney, " 'My guy wants to think about it over—during the lunch hour.' "

Defendant's statement to Lara was not a confidential communication, within the meaning of Evidence Code section 952, because, by its nature, it was meant to be communicated by the attorney to the prosecutor. Thus, it was not privileged. (*Solon v. Lichtenstein* (1952) 39 Cal.2d 75, 79-80 [244 P.2d 907]; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 119, p. 375.) Defendant's constitutional contention, which depends on his claim of privilege, fails as well.

### X. *Failure to Admit Expert Testimony or Provide Instructions on Eyewitness Identification*

█ The trial court excluded, as irrelevant, the defense's proffered expert testimony on the factors affecting the reliability of eyewitness identifications. The court also gave no jury instructions on this subject. Defendant contends that exclusion of the evidence and the court's failure, sua sponte, to instruct on this topic were error.

No eyewitness identified defendant as the person who shot and killed Koll. Testifying at the preliminary hearing in the prior robbery case, however, Koll had identified defendant as one of the robbers. The expectation that Koll would again so testify at the robbery trial provided, according to

the prosecution theory of this murder case, the motive for defendant to kill Koll. *Defendant's knowledge* of that likelihood, and *his understanding* of the strength or weakness of that expected identification, were clearly relevant to motive; indeed, defense evidence going to these points was admitted. (See *ante,* at pp. 62-63, 64.) But a psychologist's testimony regarding the factors generally affecting the reliability of eyewitness identifications did not, in itself, have any tendency to show defendant's motive to kill or lack thereof. Nor was the reliability of eyewitness testimony a matter "closely and openly connected to the facts before the court and . . . necessary for the jury's understanding of the case" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903]), such that instruction on the topic was required of the court sua sponte.

The proffered evidence being irrelevant, and the suggested instructions unconnected with the evidence, defendant's assertion that the claimed errors deprived him of due process, compulsory process, trial by jury, the right to present a defense, and subjected him to cruel and unusual punishment must also be rejected.

XI. *Refusal of Request to Make a Record Regarding a Ruling on the Order of Witnesses*

During and immediately following the direct examination of defendant, defense counsel sought to interrupt defendant's testimony in order to call Ramesh Kar, the defense paint comparison expert. The court refused the request, stating that "[t]he People have a right to timely cross-examine this witness." The court also denied counsel's request to make a further record.

Defendant contends the refusal of counsel's request to make a record was an abuse of the court's discretion depriving him of due process and a fair trial. We disagree. When counsel made the request, he had the opportunity to briefly state his reasons for wanting to immediately call Kar, but said only that Kar "is an individual who is internationally known." The court firmly believed that delay of defendant's cross-examination would be unfair to the prosecution, Kar's asserted fame notwithstanding, a judgment well within the court's discretionary control over trial proceedings and the order of proof. (§ 1044; Evid. Code, § 354.) It was neither an abuse of discretion, nor a denial of fair procedure, for the court to close discussion on this procedural point.

XII. *Exclusion of Evidence That Koll Misidentified His Robbers*

The defense attempted to present, through the testimony of Pasadena Police Officer Eugene Gray, evidence that during the investigation of

the robbery Koll had identified (from photographic arrays) three different individuals as the robbers, even though there were only two robbers. The trial court sustained a prosecution objection to such evidence, finding it irrelevant and further finding that the consumption of time and the risk of confusion necessitated by receipt of the evidence outweighed any probative value it held. (Evid. Code, § 352.)

We agree the evidence was excludable under Evidence Code section 352. Evidence that Koll had made an erroneous identification of one of the robbers from a photographic array would have been only slightly probative on the issues in defendant's murder trial. While *defendant's knowledge* of weaknesses in the robbery prosecutor's case was relevant as tending to show lack of motive, the murder jury did receive such evidence in the form of testimony from Attorney Lara and defendant. At most, Gray's proposed testimony would have tended to corroborate that evidence.[13] Even the knowledge of a weakness in Koll's robbery identification did not, however, tend strongly to disprove motive, since defendant had a motive to kill Koll, who had identified him at the preliminary hearing, regardless of whether that identification could have been challenged at trial. Possible corroboration of the existence of that flaw in the identification, then, bore only an attenuated and weak tendency to disprove motive.

At the same time, exploration of the details of Koll's pretrial robbery identifications threatened a significant consumption of time and potential for confusion. Indeed, the prosecutor and defense counsel differed, in discussion before the trial court, as to whether the evidence even showed that Koll had made any misidentification of defendant in the robbery case.[14] The trial court could reasonably anticipate that substantial time would be needed to obtain all evidence on this question. Admission of the evidence, moreover, would have tended to confuse the jury as to the questions for its decision. The more examination time spent on this issue, the greater the risk that the

[13]Defendant's offer of proof did not indicate that the weakness in Koll's pretrial identifications related specifically to his identification of defendant, rather than his codefendant in the robbery case, Phillips.

[14]The parties continue to differ on this point. The Attorney General has requested this court take judicial notice of the unpublished appellate opinion affirming defendant's robbery conviction, which the Attorney General interprets as showing that any misidentification was of Phillips, rather than defendant. Defendant objects to our taking notice of the opinion for this purpose and also asserts that the opinion shows Phillips was not misidentified, but used an alias, and that defendant's identification was only "tentative." Unpublished Court of Appeal decisions are citable without the formality of judicial notice for certain purposes, not including the use proposed here. (Cal. Rules of Court, rule 977(a).) We decline to take notice of the decision for purposes outside that rule, which further provides that such decisions may not be relied on by a court for other purposes. (*Ibid.*) The motion for judicial notice is therefore denied.

jury would lose sight of the fact that Koll's identification of defendant as a robber was not directly at issue in the murder case, and would decide the murder case on a legally incorrect ground.

The trial court did not abuse its discretion (*People v. Frye, supra,* 18 Cal.4th at p. 945) in finding that the consumption of time and the risk of jury distraction were not justified by the marginal probative value of the proffered evidence. Nor, contrary to defendant's assertion, was the evidence of such probative strength that its exclusion violated his constitutional right to present a defense. Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense (*Frye, supra,* at p. 945); certainly the marginal probative value of this evidence does not take it outside the general rule.

### XIII. *Exclusion of Evidence of Police Dispatch Tape*

■ Defendant sought to introduce a copy of parts of the Pasadena police dispatch tape for the late afternoon and evening of November 3, 1980. On the tape, according to a transcript in the record, the police dispatcher is heard to discuss, briefly and sporadically with various police officers and records personnel, an investigation she had apparently been asked to make into recent motor vehicle collisions in Pasadena.[15] In one discussion the dispatcher suggests to a Lieutenant Roberts that with Prentice Snow in custody she thought "maybe we didn't need the visor." Roberts corrects her: "We need everything we can get on this one." Earlier on the tape the dispatcher mentions to another officer that at Roberts's request she has been "looking for something in revab" in connection with a suspect in custody "from Walnut." At another point she inquires of a department administrator whether an accident at Lincoln and Walnut two days earlier involved a motorcycle. Told it did, she asks whether the motorcyclist was wearing a helmet. Told he was not, she thanks the administrator and ends the conversation.

The prosecution police witnesses had testified that the bubble shield that bore defendant's fingerprint was found in a Pasadena street around 12:40 p.m., shortly after Koll's death. Interpreting the dispatch tape excerpts as showing that the police were still in search of a visor, or face shield, much later in the day, the defense argued at the hearing on admissibility of the

---

[15]From the testimony of the dispatcher and a defense investigator, the date and time of the recording was established as November 3, 1980, after the dispatcher started her shift at 3:30 p.m. The dispatcher, for whom the tape had been played outside of court, was able to identify several of the voices heard, but had no memory of the events referred to on the tape.

tape that the dispatch tape impeaches the prosecution witnesses and tends to show the existence of a police conspiracy to manufacture evidence against defendant.

The prosecutor objected to the tape as irrelevant hearsay. After listening to the tape, the court stated that it had heard no reference to a bubble shield or visor. Interpreting the dispatcher's remarks about defendant's case as "simply her impressions," the court excluded the tape as irrelevant.

We agree with the trial court that the tape was irrelevant. Nothing said on the tape indicates the existence of a conspiracy to frame defendant. The dispatcher apparently knew little or nothing about the Koll murder investigation—until told by officers in the taped conversations, for example, she did not know who the suspected killer was or that he was in custody. Her remarks on tape are, as the trial court said, merely "her impressions" and not evidence of a police plan. Moreover, neither she nor any of the officers to whom she speaks discuss any plan to manufacture evidence against defendant.

The defense theory of relevance is apparently that discussion of a visor and a motorcycle accident in the late afternoon or evening of November 3 contradicts police testimony that the bubble shield introduced at trial was recovered in the early afternoon, and hence tends to show that testimony to be false and that the police intended to find an unrelated bubble shield and somehow link it to defendant. Even setting aside some obvious questions regarding the plausibility of the defense theory,[16] the tape is equally or more consistent with an innocent explanation than with the alleged conspiracy. Because the bubble shield had been found in a street some distance from the crime scene, it was possible that it had been deposited there as the result of a prior motorcycle accident and had nothing to do with Koll's killer. The investigating officers would logically want to exclude that possibility by determining that there had been no such accident in the vicinity in the recent past. If any inference may be made from the tape, that appears the most reasonable.

More to the point, the defense offered, and offers, no coherent factual theory for conspiratorial use of a later-recovered visor. Defendant himself testified, at both his trials, that the bubble shield introduced at trial bore his fingerprint because he pushed at it when it was thrust at him *during the afternoon court session* on November 3. The defense further presented

---

[16]Why, for example, would the hypothetical police conspirators exhaustively research past motor vehicle accidents in search of a visor when they could simply get one off a motorcycle helmet or from a store?

testimony of an attorney trying another case on that day that a helmet with a bubble shield was brought into his courtroom during the afternoon session. But if, as defendant asserts, the tape shows that into the evening of November 3 the police were still looking for a bubble shield with which to frame him, how could they have already obtained his fingerprint on one at midafternoon?

Whether taken on its own, therefore, or viewed in the context of all the trial evidence, the tape had no tendency in reason (Evid. Code, § 210) to show a police conspiracy to manufacture evidence against defendant. For the same reason, the tape's exclusion did not deprive defendant of his constitutional rights, and any error in excluding it would be considered harmless under any standard.

### XIV. *Denial of Continuance to Investigate New Trial Motion*

Defendant repeats his earlier contention that the trial court improperly denied the defense a continuance to further investigate the police conspiracy theory for presentation in a new trial motion. We have already rejected that contention. (See *ante*, pt. III.D.) The defense was given more than two months after the penalty verdict to further investigate its theory. There was no indication that a further continuance of reasonable length would have allowed defense counsel to obtain the information they asserted they were still seeking. Denial of the continuance therefore was not an abuse of discretion and did not deprive defendant of his constitutional rights to confront witnesses, to effective assistance of counsel, or to a reliable penalty determination.

### XV. *Denial of Motion to Strike Portion of Defendant's Cross-examination*

On cross-examination of defendant, the prosecutor asked whether "People's 6, the bubble shield" had been stolen from defendant's apartment building along with his blue helmet. Defendant answered that it had. On redirect, defendant said he had not heard the prosecutor ask him about exhibit 6, the bubble shield introduced at trial; rather, his answer related to the bubble shield he had purchased to use with his helmet.

Later, defense counsel moved to strike the portion of defendant's cross-examination in which he had answered that exhibit 6 had been stolen from him. Counsel represented that the prosecutor had said that eliciting that answer had been "inadvertent." Asked to confirm this, the prosecutor stated that he had said that "from the context, it was clear that we were talking

about the bubble shield that he said that he had purchased." The court denied the motion to strike.

Defendant argues the cross-examination should have been stricken, and the jury told not to consider it, because the prosecutor's questioning regarding exhibit 6 was inadvertent. Inadvertently or not, however, the question did elicit the admission from defendant that he previously had possession of exhibit 6, on which his fingerprint was found and which was found on a Pasadena street shortly after Koll's death. Although the prosecutor was apparently unaware he was asking this, and thought he was simply reviewing defendant's direct testimony with regard to a bubble shield he had owned, defendant's answer was responsive to the question asked. Defendant cites no provision of the Evidence Code limiting testimony to that the questioner intended to elicit.[17]

### XVI. *Restriction on Second Counsel in Argument*

█ Before the defense began its guilt phase argument, the trial court indicated it would allow only one attorney (Miller, the lead defense attorney) to argue, despite counsel's suggestion that Maple could better argue "the technical aspect of the experts." At this point, at least, the court was apparently unaware of section 1095, which permits two counsel to argue in a capital case. During a break in Miller's argument, however, the court reversed itself in part, offering to allow Maple to argue "the bubble shield and paint expert testimony." Defense counsel accepted the offer: Maple said he would argue "only the particular technical aspects."

Court and counsel, however, apparently understood the proposed division of argument differently; the court thought Maple would argue only the paint comparison evidence, while Maple and Miller believed Maple was to argue all the expert testimony. Thus, when Maple, after a long discussion of the paint evidence, began talking about the fingerprint on the bubble shield, the court interrupted to urge him to stay on the subject of paint because "Mr. Miller, as you know, is going to cover all the other aspects, or so I've been told." Maple, on the other hand, observed that "there is a technical aspect of

---

[17]Although he makes no distinct argument on this basis, the heading of this contention in defendant's opening brief refers to the cross-examination as "based upon facts not in evidence." Counsel objected to the cross-examination on that basis, but the motion to strike was instead made on the ground that the prosecutor's question had been "inadvertent." Nor do we believe the objection was well taken. The prosecutor asked whether exhibit 6, together with a blue helmet, had been stolen from the back of defendant's building. Defendant answered affirmatively. It is true defendant had not previously testified that the bubble shield he had owned was exhibit 6, but a question that calls for *new* information does not for that reason assume facts not in evidence.

this bubble shield and the fingerprint examination" that he wished to address. The court gave Maple an opportunity to "tie . . . up" the two subjects, and Maple argued that the absence of fingerprint powder on the bubble shield's exterior (convex) surface cast doubt on the fingerprint evidence. But when Maple then began to address the testimony of the prosecution handwriting expert, the court precluded him from continuing to do so, suggesting that Miller "pick this up" instead.

Defendant contends the trial court violated section 1095 and so restricted the defense argument as to deprive defendant of the effective assistance of counsel. The Attorney General maintains that the court's order for division of argument was within its discretionary control over trial proceedings under section 1044 and that counsel gave a competent argument.

We need not decide whether the trial court's restriction on the division of argument violated section 1095 or was within the court's discretion under section 1044. Any error did not preclude counsel from arguing the case effectively. Maple was permitted to argue the technical aspect of the fingerprint evidence, as he wished to do, and made such an argument before trying to also discuss the handwriting evidence. Maple's only question regarding the handwriting expert drew an objection, which was sustained on grounds not challenged on appeal. The record does not reflect what, if any, additional topics regarding the handwriting evidence Maple would have discussed had he been permitted to continue on that subject; nor does it provide any reason to imagine that Miller was incapable of discussing those topics, if there were any. To the extent Miller needed preparation time in order to address the handwriting (or fingerprint) evidence, the record reflects that, not long after he resumed arguing, the court recessed for the day, and reconvened the next day, providing an opportunity for such additional preparation. Thus, the record reflects no prejudice, and in particular no infringement of the right to effective assistance, resulting from the court's ruling. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184-1186 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Bonin* (1988) 46 Cal.3d 659, 694-695 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Nor do we decide whether counsel's guilt phase argument was, taken as a whole, constitutionally inadequate, a point disputed by the parties on appeal. Though Miller did not address the handwriting evidence in his resumed argument, that may well have been a tactical decision. Even if the prosecution expert's testimony were successfully attacked, the spiral-bound notebook remained linked to defendant because it was found in his automobile. The defense, as the Attorney General points out, may have decided that as to

this topic "the less said, the better." In these circumstances, where the appellate record does not reveal whether counsel had a legitimate reason for a litigation choice, we generally reserve consideration of any ineffective assistance claim for possible proceedings on petition for writ of habeas corpus. (*People v. Lewis* (2001) 25 Cal.4th 610, 674-675 [106 Cal.Rptr.2d 629, 22 P.3d 392]; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

XVII. *Standard Instructions on Circumstantial Evidence*

■ Defendant attacks four standard instructions given in his case, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1, each of which contains language advising the jury that if faced with two possible interpretations of the evidence, one reasonable and one unreasonable, "you must accept the reasonable interpretation and reject the unreasonable." According to defendant each of these was constitutionally flawed because each "sanctioned a permissive inference or factual finding against [defendant] even if it was less than more likely than not to be true."[18]

We rejected this precise contention in *People v. Bradford* (1997) 14 Cal.4th 1005, 1054 [60 Cal.Rptr.2d 225, 929 P.2d 544], and rejected closely related claims in *People v. Riel* (2000) 22 Cal.4th 1153, 1200 [96 Cal.Rptr.2d 1, 998 P.2d 969], *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887], and other decisions. Defendant's citation of federal decisions involving the constitutionality of permissive presumptions in criminal cases (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 166, fn. 28 [99 S.Ct. 2213, 2229, 60 L.Ed.2d 777]; *Schwendeman v. Wallenstein* (9th Cir. 1992) 971 F.2d 313, 316) adds no merit to his contention. The challenged CALJIC instructions do not create a presumption, permissive or mandatory, as they do not permit or require any particular ultimate fact to be inferred from any particular predicate fact; they simply direct the jury, in general, to choose a reasonable conclusion over an unreasonable one in evaluating circumstantial evidence. (*People v. Mendoza* (2000) 24 Cal.4th 130, 181 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Moreover, even if we viewed the instructions as creating permissive presumptions, we would find they met the "more likely than not" standard of *Ulster County Court v. Allen, supra,* 442 U.S. at page 166, footnote 28 [99 S.Ct. at page 2229]. When only one inference may reasonably be made from circumstantial evidence, that inference is indeed more likely than not to be true.

---

[18]Defendant also lists CALJIC No. 2.00, which does not contain the criticized language, as under attack, but makes no argument for its unconstitutionality separate from the other four instructions. In a later discussion, defendant also criticizes the use of "appears" in CALJIC No. 2.01, which he argues further dilutes the reasonable doubt standard; we disagree for the reasons stated in *People v. Hines* (1997) 15 Cal.4th 997, 1050-1051 [64 Cal.Rptr.2d 594, 938 P.2d 388].

The instructions did not deprive defendant of due process or a fair and reliable penalty determination.

### XVIII. Instruction on False Statement Showing Consciousness of Guilt

█ The jurors were instructed, by CALJIC No. 2.03, that *if* they found defendant made "a willfully false or deliberately misleading statement" concerning the crime," they could consider such statement as a circumstance tending to prove a consciousness of guilt, though not as evidence sufficient in itself to prove guilt. Defendant contends that the instruction lacked a proper evidentiary basis in this case, and that its giving therefore deprived him of his constitutional rights to trial by jury and due process.

In response, the Attorney General points to two statements the jury could reasonably have found deliberately false or misleading: defendant's statement to his attorney in the robbery case that he wanted the lunch hour on November 3, 1980, to consider the prosecutor's plea bargain offer; and defendant's statement, later that day, that he needed to urinate before he could be tested for gunshot residue. We agree these statements constituted sufficient evidence to support the instruction.

In reply, defendant first argues the instruction should not have been given because these statements "were not inconsistent with any statement appellant made at trial." However, the instruction applies whether or not the defendant himself contradicts his earlier statement. (*People v. Green* (1980) 27 Cal.3d 1, 40 [164 Cal.Rptr. 1, 609 P.2d 468], overruled on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99].) As defendant acknowledges, we have approved the instruction in several cases where the pretrial statement was shown to be false only by the testimony of prosecution witnesses. (See, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 141 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1138-1140; *People v. Green, supra,* at p. 40.)

Second, defendant argues that CALJIC No. 2.03 "should not be given in a case where the defendant's testimony is consistent with his pretrial statements even though it is inconsistent with the prosecution's case." We need not decide whether that is a correct statement of the law (see *People v. Green, supra,* 27 Cal.3d at pp. 40-41 [mentioning but not deciding the issue]) because the issue is not presented here. Although defendant testified, he did not testify that he wanted the lunch hour to consider the plea bargain offer or that he needed to urinate before being tested for gunshot residue. Indeed, he testified he did *not* make the latter statement.

Because the instruction had a proper evidentiary basis, defendant's constitutional claims are without merit.

## XIX. *References to "Innocence" in Instructions*

▮▮▮ Defendant contends that references to "innocence" in four standard jury instructions unconstitutionally altered the burden of proof by suggesting to the jury that he bore the burden of proving his innocence, rather than the prosecution having to prove guilt beyond a reasonable doubt.[19] This court and the Court of Appeal have rejected this claim in prior decisions (*People v. Frye, supra,* 18 Cal.4th at p. 958; *People v. Wade* (1995) 39 Cal.App.4th 1487, 1491-1494, 1497 [46 Cal.Rptr.2d 645]), and we do so again here. In light of the numerous instructions directing the jury to convict only on proof beyond a reasonable doubt of guilt,[20] no reasonable likelihood the jury would have understood the challenged instructions otherwise exists. (*People v. Frye, supra,* at p. 958.) Taking all the instructions together, as required, the jurors would instead have understood that while the issue before them is defendant's guilt or innocence, a conviction may be returned only if the prosecution has proved defendant's guilt beyond a reasonable doubt. Because there was no reasonable likelihood of misunderstanding, the challenged instructions did not deprive defendant of a fair trial or a reliable penalty determination.

## XX. *Instruction on Motive*

▮▮▮ Defendant complains that CALJIC No. 2.51, which, as given, stated that motive "is not an element of the crime charged and need not be shown," but that its presence "may tend to establish guilt," did not further caution the jury that proof of motive alone was insufficient to establish guilt.

If the challenged instruction somehow suggested that motive alone *was* sufficient to establish guilt, defendant's point might have merit. But in fact

[19]CALJIC No. 1.00, as given, cautioned that the fact that defendant had been arrested, charged and brought to trial was not evidence of guilt and did not make him "more likely to be guilty than innocent." CALJIC No. 2.01, as given, told the jury that of two reasonable interpretations of circumstantial evidence, one pointing to guilt and the other to "innocence," the jury must adopt the latter. CALJIC No. 2.51, as given, instructed that while motive is not an element of the charged crime, its presence may tend to show guilt and its absence may tend to show "innocence." CALJIC No. 17.47, on secrecy of balloting, cautioned the jurors not to reveal how they were divided as to "guilt or innocence."

[20]E.g., CALJIC Nos. 2.90 (People's burden of proof beyond a reasonable doubt), 2.01 (each fact upon which inference of guilt rests must be proven beyond a reasonable doubt), 4.50 (jury to acquit if alibi evidence creates reasonable doubt), 8.71 (murder and degree of murder both to be proven beyond a reasonable doubt), 8.80 (special circumstance to be proven beyond a reasonable doubt), 8.83 (each fact upon which inference of special circumstance's truth rests must be proved beyond a reasonable doubt).

the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder. When CALJIC No. 2.51 is taken together with the instruction on the concurrence of act and specific intent (CALJIC No. 3.31) and the instruction outlining the elements of murder and requiring each of them to be proved in order to prove the crime (CALJIC No. 8.10), there is no reasonable likelihood (*People v. Frye, supra,* 18 Cal.4th at p. 958) it would be read as suggesting that proof of motive alone may establish guilt of murder.

### XXI. *Instructions on Motive and the Special Circumstance Allegation*

Defendant contends that CALJIC No. 2.51, discussed above, and CALJIC No. 8.81.10, which, as given, told the jury that one element of the charged witness-killing special circumstance was that "the witness was intentionally killed for the purpose of preventing his testimony in a criminal proceeding" were inconsistent. Because motive and purpose are closely related concepts, defendant argues, the jury may have been misled into believing that the special circumstance allegation need not be proven.

We disagree. The instructions were not inconsistent, as CALJIC No. 2.51 referred to "the crime charged," i.e., murder, and not to the special circumstance allegation. Even allowing for misunderstanding on that particular point, it was not reasonably likely (*People v. Frye, supra,* 18 Cal.4th at p. 958) that the jurors would have been misled in the manner defendant suggests, as they were repeatedly and expressly instructed to find the special circumstance allegation true only if each element, including the purpose of preventing the victim's testimony, was proved beyond a reasonable doubt.[21] The instructions, taken as a whole, did not deprive defendant of a fair trial or a reliable penalty determination.

### XXII. *Instruction Defining Reasonable Doubt*

Defendant contends that CALJIC No. 2.90, as given, unconstitutionally lessened the standard of proof beyond a reasonable doubt because it used the phrases "moral certainty," "moral evidence," and "abiding conviction." We have repeatedly rejected this contention (see, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 668 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Hines, supra,* 15 Cal.4th at p. 1051; *People v. Ray* (1996) 13 Cal.4th 313, 347 [52

---

[21]See CALJIC Nos. 8.80 (special circumstance must be proven beyond a reasonable doubt), 8.81.10 (elements of special circumstance; each must be proved), 8.83 (each fact upon which inference of special circumstance's truth rests must be proved beyond a reasonable doubt), 8.83.1 (circumstances showing mental state for special circumstance must be proved rationally irreconcilable with absence of mental state).

Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Freeman* (1994) 8 Cal.4th 450, 501-505 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]) and have been given no reason to reconsider those decisions here.

*Penalty Phase Issues*

XXIII. *Failure to Substitute New Counsel for the Purpose of Penalty Phase Argument*

▮ Defendant contends the judgment of death must be reversed because the court accepted defense counsel's waiver of penalty phase argument to the jury on his behalf. Specifically, defendant argues that the court was duty bound to appoint new counsel for that single purpose once defendant responded affirmatively to the court's inquiry whether he would accept the proposed substitution of counsel.[22] For reasons next explained, this claim of trial court error must be rejected on appeal. Moreover, resolution of the closely related question whether counsel's failure to present any penalty phase arguments constituted ineffective assistance of counsel must await formal presentation of the claim in a petition for writ of habeas corpus predicated on an adequately developed factual record.

A. *Background*

After conclusion of the People's case in aggravation of penalty, the defense rested without introducing any evidence. Questioned outside of the jury's presence, counsel indicated that although their investigation had produced some evidence regarding defendant's character, background, and mental and physical condition, they did not wish to present any of it. Defendant personally affirmed that counsel had consulted with him and had informed him of the right to put on mitigating evidence, and that he wished to forgo the exercise of that right.

The court told counsel for both parties that each side would have one opportunity for argument, the prosecution first and the defense last, but that both attorneys for each party could argue if they wished. Prosecutors Holliman and Lutes then argued for the People, emphasizing the aggravating circumstances of the crime. The next morning (July 18, 1990), after a discussion about an instruction to be given on lingering doubt as a factor in mitigation, the court called on the defense for argument. Counsel Maple responded, "If your Honor pleases, on behalf of Mr. Miller and myself, we will submit the case to the jury without argument."

---

[22]The claim is contained in a supplemental brief which defendant was permitted to file subsequent to the filing of his opening brief.

Outside the presence of the jury, the court expressed its "astonish[ment]" that after receiving a continuance, and court funding, to perform investigation for the penalty phase of trial, the defense offered no witnesses and "not one word to the jury." The court then asked counsel why they were not presenting "a sympathy or any other moralistic reason or any other reason on behalf of Mr. Snow." After counsel conferred privately, the following colloquy occurred:

"The Court: Does counsel for the defense wish to respond to the court's inquiry?

"Mr. Maple: I do not, your Honor.

"The Court: Mr. Miller?

"Mr. Miller: No, sir.

"The Court: Let the record reflect that this court has expended a great amount of funds as to this penalty trial for the defense attorneys' investigation as to factors in mitigation. I have continued this trial almost six weeks [for penalty phase investigation]. I don't know what the billings are for all these investigators in other states, but not one witness was called on behalf of Mr. Snow at the penalty trial. This astonishes the court. . . . Not one word is being argued in his behalf as to the penalty aspect of this trial before this jury. May I know why, counsel? Mr. Miller, have you any reply?

"Mr. Miller: No, sir. No, your Honor.

"The Court: Mr. Maple?

"Mr. Maple: No, your Honor.

"The Court: I am going to recess this matter until 1:30. I wish to get a representative from the State Bar here."

The jury was then released for lunch and told to return at 1:45 p.m. Outside the presence of the prosecutors, the court continued its inquiries of defense counsel:[23]

"The Court: Record should reflect that in the penalty trial the defense has presented no evidence in mitigation in behalf of Mr. Snow, and today I've

---

[23]The transcript of this hearing held outside the presence of the district attorney was originally filed under seal. Both defendant and the Attorney General have been provided copies of the transcript, both sides have briefed its contents, and neither objects to unsealing it. Accordingly, the transcript in question is hereby ordered unsealed.

learned that there will be no offer of arguments in behalf of Mr. Snow. Mr. Miller, is this pursuant to the wishes of the defendant?

"Mr. Miller: Your Honor, I'm in no position to answer the court's question.

"The Court: Thank you. Is this pursuant to tactical reasons that you have developed in the course of this trial?

"Mr. Miller: I cannot answer the court's question.

"The Court: And why, may I ask, are you not presenting arguments or any evidence in mitigation in light of the expenditure of this court in behalf of your defense?

"Mr. Miller: Your Honor, I cannot answer the court's question.

"The Court: Mr. Snow, I inquired of you yesterday whether or not you were aware that you have a right to present evidence in this case . . . . I believe I gave you a rundown as to what factors in mitigation you may present. It may pertain to the case itself, it may pertain to your background, physical or mental condition, as well as any character evidence that you may have. There was none. Are you aware that you can have this evidence presented, Mr. Snow?

"The Defendant: Yeah.

"The Court: Thank you. And today to the court's astonishment, and I've never had this happen, and I know of no court in which there has been no arguments whatsoever as to the attorneys.

"You realize that I cannot force your attorneys to argue. They have a right to waive that argument. However, I want you to be aware, if you want someone to argue in your behalf, I will gladly appoint another lawyer and to have him review this case for purposes of arguments.

"Mr. Snow, are you aware that you—that the arguments before this jury in your behalf can cover great areas such as sympathy, moral factors, as well as any background evidence that you may have? Among the background evidence that could be presented to the jury is that you have been in custody since 1980, to my knowledge, and for the last 10 years perhaps there ha[s] been no evidence of you being not a model prisoner. That could be a factor in mitigation.

"There are so many aspects to factors in mitigation as to your case. You understand this Mr. Snow?

"The Defendant: Yes.

"The Court: Do you wish the court to appoint another lawyer in your behalf?

"The Defendant: Yes.

"The Court: Thank you. This will be for the purposes of the arguments in this case. Do you understand this?

"The Defendant: (Defendant nods head in the affirmative.)

"The Court: Was Mort Borenstein here?

"The Clerk: He was here this morning.

"The Court: Can we get him here at 1:30[?]

"The Clerk: I will call his office.

"The Court: I am going to try to find Mr. Mort Borenstein who tried a capital case by the name of People versus Beltran in this case [*sic*: court] and was able to obtain a verdict of not guilty. I know him to be a very resourceful as well as a most competent attorney. I want him. I am going to try to get a hold of him; have him here at 1:30 this afternoon."

After a recess, the court reconvened at 1:40 p.m., again outside the presence of the jury and district attorney. The court continued its examination of defense counsel regarding their obligation to present mitigating evidence if any was available. Attorneys Maple and Miller responded that they needed the advice of counsel and had obtained such representation in Attorney Robert Gerstein, who was present outside the courtroom. Maple further asserted that Gerstein had been previously appointed counsel for defendant, having been appointed "for all purposes" by Judge Xanthos, presiding judge of the same court, who in his capacity as master calendar judge, was handling counsel and expert witness appointments and investigator funding. The trial court (Judge Tso), taking apparent umbrage at the assertion that, without his knowledge, an attorney had been appointed in this case "for all purposes," invited Judge Xanthos into the courtroom to confirm or disprove the claim. Before he arrived, the following colloquy occurred:

"Mr. Maple: Thank you.

"I wish to amplify the record so that it is complete and not incomplete, your Honor. If I may be heard in this regard.

"Mr. Gerstein's status in the case occurred as a result of Mr. Miller and myself deciding to take a writ. We employed him. Utilizing trust funds that were provided by Judge Xanthos, among other things. Your Honor has no knowledge of the reasons for it. Except to the extent that you were furnished a copy of the petitions for the writs. Over the signature of Mr. Gerstein as counsel for Mr. Snow.

"Now, in this present situation unbenounst [*sic*] to your Honor there are factors that I cannot disclose to you. And because if [*sic*: of] your statements about involving the State Bar, Mr. Miller and I asked Mr. Gerstein to come here to represent Mr. Snow for the purpose of explaining that to the court. And I think we have a right to do that.

"The Court: What will he explain to the court?

"Mr. Maple: I am not going to say anything further in that regard because that is his job. Not mine.

"The Court: All right. Thank you."

Judge Xanthos then arrived and stated he had no recollection of having ever appointed Gerstein for any purpose. Finally, the court agreed to hear Gerstein, and the following discussion ensued:

"The Court: What's your purpose for being present today, please?

"Mr. Gerstein: Well, I was called by Mr. Maple on the basis that I have been involved in this case and have been representing the defendant in the appellate courts, or did at least on the writ matter, and have continued to consult with them; that they had gotten into a situation where they were concerned that there might be a conflict in their making an argument which they felt should be made on Mr. Snow's behalf.

"That is to say, they were concerned because of the threat of State Bar sanctions against them and that put them into a—

"The Court: Because of what?

"Mr. Gerstein: Because of the threat of, as I understood it, your Honor, of State Bar sanctions against them. Possibly, because of their conduct.

"The Court: For what purpose? Why?

"Mr. Gerstein: Well, apparently because of—as I understood it, your Honor, because of your concern that they were not making any presentation of evidence or argument at the penalty phase in this matter.

"The Court: And what is—well, why are you here now?

"Mr. Gerstein: Because they felt that that put them into a, at least awkward, an awkward situation to make the argument for their—

"The Court: They stated that they had no argument.

"Mr. Gerstein: No. I'm sorry, your Honor, their argument that they should continue to represent Mr. Snow and that it would be an interference with his right to counsel to have someone else now appointed by you to carry on with the penalty phase. That argument, your Honor.

"The Court: Well, all that's left is the arguments.

"Mr. Gerstein: Yes.

"The Court: Because there was no presentation of factors in mitigation.

"Mr. Gerstein: Yes, I understand that.

"The Court: I've cited the *Deere* case on the record.[24]

"Mr. Gerstein: Yes.

"The Court: That requires them, as officers of the court, to present factors in mitigation, if any.

"The Court [*sic:* Mr. Gerstein]: Well, yes, your Honor. That was precisely their—that was precisely their concern.

"They have shared with me some of the confidential material on the basis of which they have made their considered judgment that, in the interest—in Mr. Snow's interest, that they should not present any evidence, your Honor.

"The Court: I had asked them whether or not they were doing this based upon the request of the defendant or if it was a tactical matter, and both the attorneys had refused to answer the court. So the court was left in a dilemma

---

[24]The court had earlier referred counsel to *People v. Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925].

of not knowing what to do with respect to that in light of *People versus Deere.*

"Mr. Gerstein: Uh-huh. Well, your Honor, my understanding is that they are—

"The Court: Now, with your statement, it appears that it's solely tactical, and the presumption is that evidence to the contrary, the appellate court will take that presumption.

"Mr. Gerstein: Well, your Honor, perhaps I have gone too far in saying that.

"The Court: Well, you've made the statement and I've accepted it.

"Mr. Gerstein: I've—I understand—what I do want to say, your Honor, is that they are representing the client's best interests in their professional judgment. Now, I did not mean to—

"The Court: That's all I want to hear.

"Mr. Gerstein: —I did not mean to say by that that this was not the defendant's judgment or that it was the defendant's judgment, that that was not taken into account. I have no intention of saying that or that it was a tactical decision as opposed to any other sort of decision, but—

"The Court: Your statements to the court relieves the court's mind in that you have talked with the attorneys and they have indicated to you the reason.

"Mr. Gerstein: Yes.

"The Court: And I'll accept that. I will now instruct the jury.

"Mr. Gerstein: Okay.

"The Court: Thank you.

"Mr. Gerstein: Thank you.

"The Court: Now, Mr. Snow, the law requires that the attorneys control the proceedings as to any criminal case, and that would include the arguments or no arguments. They have elected to waive arguments and that is their right. That right affects you. So what I'm going to do is proceed and accept the waiver of arguments and simply instruct the jury."

Defendant made no response on the record. The prosecutors were then readmitted to the courtroom. After further discussion of proposed instructions, the court began instructing the jury. The penalty phase instructions included the following admonition: "The jury is instructed not to draw any adverse inference from the defendant's failure to testify at the penalty trial or offer evidence in mitigation or arguments by his attorney. The jury must decide for itself the appropriate penalty based on the factors previously given by the court." At the request of the defense, the court also instructed the jury on lingering doubt and the burden of proving identity through eyewitness testimony.

Also relevant to our inquiry regarding this claim are certain confidential "Declaration[s] Re Preparation For Penalty Trial" filed by Miller and Maple in the superior court's master calendar department on the date the penalty phase was commenced (July 17, 1990), as well as the declaration of Joel A. Sickler, a court-appointed defense investigator, which was appended to Maple's July 17 declaration, and a second declaration by Maple filed on July 18, the second day of the penalty phase and the date on which the events giving rise to this claim transpired.[25]

Miller stated in his July 17 declaration, among other things, that "The defendant advised both counsel that he would not aid in their preparation for penalty trial. He also advised counsel that he did not want any member of his family called as a witness at his penalty trial, and that he had instructed all

---

[25]The documents are part of the record on appeal and are found in the confidential supplemental clerk's transcript on appeal, in the confidential files maintained pursuant to section 987.9. Given that they were submitted to the master calendar department pursuant to the confidential procedures outlined in section 987.9, they would normally not have been brought to the attention of the trial judge. The parties were afforded notice that the court was considering referencing the declarations in connection with this claim. Respondent has no objection to the unsealing of the documents. Defendant has objected, noting he has had no opportunity to cross-examine the declarants, that the "untested and unsubstantiated information" in the declarations is "insufficient and inappropriate for use by this Court for purposes of direct appeal," and that "[t]his subject is more properly relegated to habeas corpus proceedings."

We conclude that confidentiality no longer requires that the declarations remain under seal, and they are hereby ordered unsealed. We agree with defendant that the declarations are untested in that defendant as yet has had no opportunity to cross-examine the declarants regarding the contents of the declarations, and that although the documents are part of the record on appeal, they may not be considered by this court as conclusive evidence bearing on the merits of this issue in the automatic appeal. However, although we do not treat the declarations as establishing the facts averred therein, we can and do consider them as raising a reasonable inference that counsel had reasons for performing as they did at the penalty phase of trial, reasons that are not fully reflected in the cold transcript of the penalty phase proceedings. We agree with defendant that the "subject" of counsel's performance at the penalty phase, and the matter of the veracity and reliability of their declarations, are "more properly relegated to habeas corpus proceedings."

family members not to cooperate with defense counsel or their investigators. [¶] I submitted visiting passes at the Los Angeles County Men's Central Jail, where the defendant is housed, on June 15, 19, 21, 22, 1990, and on July 11, 1990. The defendant would not respond to any of the requests for a visit. He advised the Sheriff that he was refusing, in each instance. I have not spoken to the defendant since our last court appearance on June 12, 1990." Miller further related that "After a guilty verdict was rendered against the defendant, I contacted [court-appointed defense investigator Joel A.] Sickler to . . . update an earlier report by the California Appellate Project, interview all family members and potential penalty phase witnesses, and to inspect the [defendant's] institutional record. Mr. Sickler rendered his report on July 16, 1990. His report reveals, in essence, [defendant's] institutional record, and other facts about his family background contained in official documents. No family member would consent to an interview. [¶] This declaration is submitted so that the appellate Court will be aware of the posture of the defense as we proceed into penalty trial."

Maple stated in his first declaration (July 17, 1990), among other things, that "On June 27, 1990 I was contacted by Harraletta Murphy, the oldest sister of defendant . . . indicating her concern about the health of defendant. She related that she had received a telephone call from . . . a prisoner in the Los Angeles County Central Jail [relating] that defendant, after a visit by members of defendant's family at the visiting screen of the jail, reportedly had been assaulted by deputy sheriffs in the jail and was in the hospital. Harraletta Murphy requested that I investigate the matter. I immediately contacted the Sheriff's medical facilities and was unable to confirm any hospitalization of the defendant." Maple went on to relate that he contacted Miller regarding the concerns of defendant's family, and that Miller informed him defendant had been refusing visits from both Miller and defense investigator Sickler. Maple then related that on July 11, 1990, he was contacted by Marcia Brunier, another sister of defendant who had visited him in the jail, and "Ms. Brunier confirmed that she and other members of the family had been advised by the defendant not to cooperate in any penalty investigation by defense investigators and Mr. Miller but that defendant would consent to a visit in the Central Jail Attorney Room by me [Maple] only."

Maple continued in his declaration, "On July 12, 1990, after conferring with [Miller and Sickler,] I visited [defendant] at the Central Jail Attorney Room in Los Angeles. In the course of the interview with the defendant, I discussed the incident that occurred after the family visit at the Jail Visiting Screen which involved a complaint by the defendant about the visiting screen telephones which did not operate. Mr. Snow confirmed that there was

a physcial [*sic*] encounter between himself and members of the Sheriff's Department because of his persistence in making a complaint about the visit. Mr. Snow also confirmed that he refused interviews with Mr. Miller and the penalty phase investigator and indicated that he had advised members of his family not to assist in any investigation by the defense for the penalty trial."

In his affidavit dated July 16, 1990, and appended to Maple's July 17 declaration, defense investigator Sickler averred, among other things, that on June 7, 1990, Miller telephoned him and explained that he would be needed to conduct a penalty phase investigation after all. Miller asked Sickler to review a California Appellate Project penalty phase type report that had been prepared by a California Appellate Project investigator, and "verify its contents and to update it. He also asked me to interview Snow at the county jail, speak with members of Snow's family, and inspect his institutional record." Sickler then explained, "My investigation began on June 8, 1990. In the course of my work, I contacted several members of defendant's family. I was told by each family member that they (members of the Snow family) were instructed by the defendant not to cooperate with my investigation. In fact, the defendant's older sister, Harraletta Murphy, his father and step-mother, Fentress & Jacqueline Snow, told me in effect, that they would have no comment and would not grant me an interview. In addition to speaking with Harraletta Murphy, Fentress Snow and Jacqueline Snow, I telephoned Marcia Brunier (a sister), Barbara Snow (a sister), Benito Snow and Keith Snow (both brothers). Messages were left for each on approximately three occasions. As of July 16, 1990, I did not receive a return phone call or any sort of reply from these family members."

Sickler also reported in his affidavit that he had attempted to visit defendant in the central jail on July 2, 1990, and was told by the deputy on duty that defendant was refusing to see him. Last, Sickler related that, "while I was unable to interview Snow or any members of his family, I was able to retrieve and inspect various public records which detailed Snow's personal history. These records were obtained from the California Department of Corrections, California Youth Authority, Los Angeles County Recorder, Pasadena Board of Education, Pasadena City College, City of Pasadena, Bushnell Optical (a private company), California Appellate Project, and the Kansas City, Missouri, Division of Vital Records."

In his second declaration, filed July 18, 1990, Maple stated, "On July 17, 1990, I discussed with [defendant] the impact of [defendant's physical encounter with sheriff's deputies in the jail visiting room], if known to the prosecution, as probable rebuttal evidence to any testimony that might be offered on his behalf by penalty investigator Joel A. Sickler and shared

with him the results of [Sickler's] investigation which contained much favorable information concerning his [defendant's] conduct while in custody over the years." Maple then explained that he was still trying to learn additional information about the "physical encounter" incident from the jail inmate who had reported it to defendant's sister, but that the inmate was refusing an interview with him. Maple stated, "I told my client that in my judgment under the circumstances and present posture of the case, that no defense material should be presented to the jury. Mr. Snow concurred in the judgment."

### B. *Analysis*

Defendant contends that the trial court, rather than accepting counsel's waiver of penalty phase argument on defendant's behalf, should have appointed new counsel for the purpose of making a penalty phase argument to the jury. If additional time was needed, defendant argues, the court should have continued the penalty trial on its own motion, or, if that course was deemed impractical because of constraints on the jurors' availability, declared a mistrial of the penalty phase. The Attorney General, in response, surmises that defense counsel's decision to present no penalty phase argument was a tactical one. The trial court, the Attorney General argues, could not properly have appointed new counsel for purposes of argument merely· out of disagreement with Miller's and Maple's sense of "appropriate strategy."

The issue is both complex and troubling. Troubling because, assuming a capital murder defendant going into the sentencing phase of his trial is determined that his life should be spared, it is difficult to imagine how a penalty phase in which counsel present no mitigating evidence, call no witnesses, refrain from cross-examining the prosecution's witnesses, and make no argument to the jury on the defendant's behalf, could ever produce a reliable penalty verdict. On the other hand, this claim does not arise in a vacuum. We have noted that defendant was previously convicted and sentenced to death on the instant charges. We reversed the earlier judgment in *People v. Snow, supra,* 44 Cal.3d 216, because of the prosecutor's misuse of peremptory challenges in jury selection. Two penalty phases were conducted during the course of that first trial, at which Halvor Miller, defendant's lead counsel in this trial, was also lead defense counsel. The record of the first penalty phase proceeding[26] reflects that defendant adamantly refused to cooperate with any defense strategy designed to spare his life, and indeed, was determined to receive the death penalty.

---

[26]By earlier order of this court, the parties were afforded notice that the court was considering taking judicial notice of the public records of the first penalty phase proceeding of defendant's first trial, portions of which we now judicially notice and make reference to

Defendant stated on the record at the first penalty trial that he had "directed Mr. Miller not to offer any mitigating circumstances or any mitigating evidence to oppose the prosecution's case of aggravating circumstances. I don't feel that there are any. . . . [¶] . . . [I]f I am guilty of murder, I do not want to go to prison for the rest of my life and I would prefer—and I would explain that to the jury that I would prefer that the jury sentence me to death." When pressed by the trial court as to whether they objected to defendant's proposed course, Miller and his cocounsel ultimately stated they took no position in light of his right to testify. The matter proceeded accordingly, with defendant taking the stand and testifying that in his opinion there were no factors in mitigation, that he had instructed his attorneys not to present any argument for life imprisonment, and that he did not want to go to prison for the rest of his life. After approximately one day of deliberation, the jury returned a verdict of death. Thereafter, the trial court granted a new trial motion as to penalty based upon the giving of an improper commutation instruction. (See *People v. Snow, supra*, 44 Cal.3d at p. 221.)

The second penalty trial did not fare much better for the defense, which again offered no mitigating evidence, but did submit its guilt phase evidence in support of a lingering doubt defense, which Miller argued to the jury at some length. The second jury, like the first, returned a verdict of death.

In short, from the record of the first trial, it is quite clear that defendant at that time was opposed to the presentation of any case in mitigation, *including argument to the jury*, and that Attorney Miller had to work within those extreme limitations imposed by his client, to whatever extent possible. At the very least we know that Miller was capable of making an appropriate record and demonstrated that he could make a thorough final argument for lingering doubt.

The course of events at this penalty trial was even more extraordinary. The defense not only rested without making an opening statement, calling

herein. (Evid. Code, §§ 452, 459, subd. (b).) We note that defendant took the position during the briefing stage of this appeal that the record on appeal should be augmented to include the entire record of his first trial on these charges. Now, however, defendant objects to the court taking judicial notice of a portion of the same materials, urging that "[a]t the first penalty trial [defendant] expressed the sentiment that he wanted no effort expended on his behalf and that he preferred to die rather than spend the rest of his life in prison. This is irrelevant for purposes of resolving the instant appeal, especially since the instant record does not reflect that [defendant] expressed any similar sentiment."

Although we agree with defendant that evidence of his sentiments at his first trial cannot be imputed to his state of mind at this trial, we are not considering the portions of the transcript of the first penalty trial for that purpose, but are instead considering the events that transpired at the first penalty trial as they bear upon Lead Counsel Miller's state of mind, knowledge, and reasons for his acts and omissions in his representation of defendant at this penalty trial.

any witnesses, introducing any other evidence, or cross-examining any of the prosecution witnesses, but, following the prosecutor's closing argument, defense counsel announced they would submit the case without any argument. Counsel further refused to tell the court their reasons for this decision. Yet defendant, when asked by the court at one point whether he wanted a new attorney appointed to argue to the jury in his behalf, answered "yes." Finally, assured by still another attorney, who had earlier in the trial assisted Miller and Maple in presenting a petition for writ of mandate to the Court of Appeal, that the two appointed attorneys were "representing the client's best interests in their professional judgment," the trial court accepted their decision not to make a penalty phase argument and submitted the case to the jury.

A close reading of defendant's supplemental brief reveals that his argument that his death judgment must be reversed on appeal rests on two alternative grounds. Defendant first contends that *trial court error* requires reversal on appeal. He argues that the court, by refusing to appoint new counsel to make a penalty phase argument after he had responded affirmatively to the court's inquiry whether he would accept appointment of new counsel, thereby "failed to safeguard Mr. Snow's rights to due process and a fair trial during the penalty phase, to assure the attainment of a fair and accurate penalty determination, and to assure that Mr. Snow was afforded assistance of counsel during the penalty phase." Alternatively, defendant argues that reversal on appeal is also required as a result of Miller's and Maple's *ineffective assistance of counsel* at the penalty phase. The two grounds are closely intertwined.

Defendant recognizes that normally a claim of ineffective assistance of counsel is appropriately raised in a petition for writ of habeas corpus (see, e.g., *People v. Mendoza Tello, supra,* 15 Cal.4th 264), where relevant facts and circumstances not reflected in the record on appeal, such as counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform the two-pronged inquiry of whether counsel's "representation fell below an objective standard of reasonableness," and whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674].) But defendant nonetheless also argues that counsel's performance at the penalty phase was so deficient that it must be deemed to have "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing" (*United States v. Cronic* (1984) 466 U.S. 648, 659 [104 S.Ct. 2039, 2047, 80 L.Ed.2d 657] (*Cronic*)), thereby relieving appellate or habeas corpus counsel of the burden, which they would otherwise

bear under *Strickland v. Washington*, *supra*, 466 U.S. 668, of showing that specific deficiencies in trial counsel's performance prejudicially affected the penalty trial.

Since counsel's assertedly deficient performance is at the root of this claim, we address it first before turning to the closely related question whether the trial court itself committed reversible error by failing to appoint new counsel to make a penalty phase argument in defendant's behalf.

### 1. *Ineffective assistance of counsel*

It is settled that the failure to present any mitigating evidence on behalf of the defendant at the penalty phase of a capital murder trial does not, in and of itself, render a judgment of death constitutionally unreliable. (*People v. Lang* (1989) 49 Cal.3d 991, 1029-1033 [264 Cal.Rptr. 386, 782 P.2d 627] (*Lang*); *People v. Bloom* (1989) 48 Cal.3d 1194, 1228 [259 Cal.Rptr. 669, 774 P.2d 698].) As we observed in *Lang*, "To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client." (*Lang, supra,* at p. 1031.)

Here, counsel's confidential declarations in the record on appeal raise a reasonable inference that defendant did not desire, and indeed would not permit, defense counsel to investigate or present any family background evidence in mitigation of penalty. According to counsel's declarations, defendant had instructed his family members not to cooperate with the defense, thereby eliminating them as potential witnesses in his behalf. Defendant had also agreed that, as a matter of trial strategy, evidence of his good conduct while in custody should not be presented to the jury because it would open the door to impeachment with evidence of his recent involvement in an altercation with sheriff's deputies in the central jail. On this state of the record, it may also be reasonable to infer that counsel knew, or reasonably believed, that defendant did not desire them to present any argument to the jury in his behalf.[27] As the confidential declarations outlined above reveal, defendant had steadfastly refused to cooperate with any investigation or defense strategy in preparation of a case in mitigation of penalty.

---

[27] On the day the jury returned its verdict of guilt, Miller requested a continuance of the penalty phase in order to thoroughly investigate defendant's background in preparation of a case in mitigation of penalty. When the court addressed defendant directly to inquire whether he would agree to the continuance, defendant stated: "Let's do it today and get it over with." When the court responded by suggesting that defendant "Talk to your attorneys, please," defendant again repeated, "Do it today and get it over with." After further discussion, the court ultimately granted the defense a continuance of nearly six weeks for further preparation of the defense case in mitigation.

He had instructed his relatives not to cooperate with defense counsel or their investigator. He had refused all jailhouse visits or communication with Lead Counsel Miller during the six-week break between the guilt and penalty phases of trial—a continuance that had been granted for the very purpose of allowing further investigation and preparation of a case in mitigation of penalty. And he had agreed with Maple that evidence of his past good conduct while in custody should be withheld from the jury for tactical reasons. Moreover, having represented defendant at the first trial of these charges, Miller knew that defendant once before had directed him not to offer any mitigating evidence in opposition to the prosecution's case in aggravation, and that defendant had personally taken the stand and told the jury that in his opinion there were no factors in mitigation of penalty, that he had instructed his attorneys *not to present any argument for life imprisonment*, and that he did not want to go to prison for the rest of his life.

If the truth of the matters related in the confidential declarations are established at a habeas corpus proceeding, it might well be concluded that counsel must have known or believed that defendant did not want them to argue to the jury to spare his life. But unless and until we know with certainty all the reasons for counsel's actions and omissions at the penalty phase, specifically, counsel's determination to waive penalty phase arguments, we cannot make a fully informed judgment as to whether Miller and Maple rendered ineffective assistance of counsel at that phase of trial based on the record on appeal. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.) Although Miller and Maple, reasonably or unreasonably, obviously believed that confidentiality or attorney-client privilege prohibited them from revealing to the court their reasons for forgoing the presentation of any mitigating evidence, it is less clear from the record what motivated counsel to refrain from making any penalty phase argument. Similarly, although counsel may have reasonably believed that to make a penalty phase argument to the jury to spare defendant's life would contravene defendant's wishes, given all of his efforts to thwart the investigation or preparation of a case in mitigation of penalty, to so conclude on this record would likewise require speculation.

It is clear that the court ultimately determined to defer to Miller and Maple's reasoned judgment, once the court became convinced, after hearing Attorney Gerstein state that "they are representing the client's best interests in their professional judgment," that Miller and Maple were acting consistently with their client's desires or interests. What remains unclear from the record on appeal is precisely what reasons in fact led counsel to conclude that penalty phase arguments should be waived.

The Attorney General "surmises that defense counsel sought to preserve an inadequacy of counsel issue for appeal." As the argument goes, one can

imagine no valid strategic reason for competent defense counsel to waive penalty phase arguments on behalf of the defendant *in the face of his express wishes to the contrary.* Accordingly, by opting to forgo making an opening statement, calling any witnesses, introducing any other evidence, or cross-examining any of the prosecution witnesses, Miller and Maple must have intended to lay the groundwork for a successful claim, on appeal or in a petition for writ of habeas corpus, that they had "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing" (*Cronic, supra,* 466 U.S. at p. 659 [104 S.Ct. at p. 2047]), thereby relieving appellate or habeas corpus counsel of their usual burden under *Strickland v. Washington, supra,* 466 U.S. 668, of establishing prejudice from counsel's deficient performance.

The problem with this argument, separate and apart from its speculation that trial counsel were willing to cast aside their ethical obligations and fall on their swords to build reversible error into the trial of a client who was adamantly unwilling to assist or cooperate with them in preparing a defense in a trial for his life,[28] is that it fails to assign to defendant any role or responsibility whatsoever for the manner in which the penalty phase of his trial unfolded below. Indeed, defendant suggests in his supplemental brief that "[a]s usual, caught in the middle of the debacle was Mr. Snow"—the "debacle" being counsel's asserted wholesale abandonment of their client at the penalty phase and the trial court's erroneous refusal to appoint new counsel for the purpose of making a penalty phase argument in the face of counsel's deficient performance.

Unlike defendant and our colleagues in dissent, we are unwilling to repose uncritical confidence in defendant's single answer "yes" to the court's initial inquiry whether he would agree to a substitution of counsel for the purpose of making a penalty phase argument.[29] Nor do we believe that defendant's affirmation that he would accept the appointment of new counsel for the

[28]The very fact that Miller and Maple saw fit to file confidential declarations with the master calendar judge relating their difficulty in obtaining defendant's cooperation in the investigation and preparation of a penalty phase defense militates against an inference that they intentionally forwent the presentation of penalty phase arguments for the purpose of building reversible error into their client's cause. Miller concluded his declaration with the statement that "[t]his declaration is submitted so that the appellate Court will be aware of the posture of the defense as we proceed into penalty trial." Why would he include such an explanation if he was intent on building reversible error into defendant's trial?

[29]No less than six times in the concurring and dissenting opinion, defendant's single answer "yes" to the court's initial inquiry is characterized as a specific, express, and unambiguous request for the appointment of new counsel. (See *post,* at pp. 129 ["indeed, he expressly *requested*—the presentation of an argument to the jury" and "expressly requested new counsel"], 130 ["defendant instead asked for another lawyer to be appointed to do what his current lawyers refused to do" with an "express and unambiguous statement on the record"],

purpose of making a penalty phase argument necessarily reflects that Miller and Maple contravened defendant's express wishes by themselves refusing to make such an argument, thereby rendering ineffective assistance of counsel. Defendant's affirmative answer to the court's inquiry, if considered in isolation, might support an inference that he wanted a penalty phase argument made in his behalf, whether by Miller and Maple or, if they would not do so, then by newly appointed counsel. But what should we make of defendant's other conduct, which was entirely *inconsistent* with such an inference? What would defendant have expected Miller and Maple to argue to the jury once he had thwarted their every effort to investigate and prepare a defense in his behalf for the penalty phase? And what could defendant have reasonably expected newly appointed counsel to argue in his behalf, given the restraints he had placed on his own penalty trial? It is perhaps just as likely that defendant answered "yes" to the court's inquiry upon realizing that the appointment of new counsel at that late stage of trial might result in a lengthy delay or continuance, or perhaps even better, a mistrial. But once again, to so conclude would require some measure of speculation on the limited record on appeal before us. We nevertheless view all the circumstances as raising a reasonable doubt that defendant, by his single answer "yes" to the court's inquiry, was necessarily expressing a genuine and unambiguous desire that a penalty phase argument be made to spare his life.

Notwithstanding defendant's unwillingness to cooperate in his own penalty phase defense, and his agreement with Maple that mitigating evidence of his good conduct while in custody should not be presented for tactical reasons, it might still be concluded that counsel, at the very least, could have argued lingering doubt to the jury, consistent with defendant's position at the guilt phase that he had nothing to do with Koll's murder. But then again, Miller had taken that tack at the second penalty phase of defendant's first trial, and he knew that, as a matter of trial tactics, it had proved unsuccessful on that occasion. Experience therefore may have led Miller to conclude that, once this jury unanimously found that the guilt phase evidence established defendant as Koll's murderer beyond a reasonable doubt, it was better to simply submit the matter of lingering doubt at the penalty phase on an appropriate lingering doubt instruction, without arguing lingering doubt to the jury and thereby drawing further attention to the guilt phase evidence.

As the high court explained in *Cronic,* "Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is

---

132, fn. 2 ["defendant specifically and expressly stated that he *did* want argument presented on his behalf"], 137 [trial court accepted counsel's waiver of argument "contrary to defendant's expressed wishes"] (conc. & dis. opn. of Werdegar, J.).)

no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade. [Citation.]" (*Cronic, supra,* 466 U.S. at p. 656, fn. 19 [104 S.Ct. at p. 2045].) We recognize that *Cronic* was not a capital murder case.[30] And we further recognize that, at least in the abstract, there can always be a bona fide argument made to the jury at the penalty phase of a capital murder trial that the defendant's life should be spared. ▮ But as we explained in *Lang,* which was an automatic appeal from a judgment of death, "an attorney's duty of loyalty to the client means the attorney 'should always remember that the decision whether to forego legally available objectives or methods *because of non-legal factors* is ultimately for the client . . . .' (ABA Model Code Prof. Responsibility, EC 7-8.)" (*Lang, supra,* 49 Cal.3d at p. 1031, italics added.)

▮ If Miller and Maple, knowing their client had refused to permit them to conduct a meaningful investigation to build a case in mitigation of penalty, also knew, or reasonably believed, that defendant was likewise desirous that no argument be presented to the jury in his behalf, it might well be concluded that counsel were simply following what they believed were their client's wishes in waiving penalty phase arguments, and such omission would not constitute ineffective assistance of counsel within the meaning of *Strickland v. Washington, supra,* 466 U.S. 668. Indeed, we might conclude on that same showing, that defendant, by his own actions, is estopped at the threshold from claiming ineffective assistance based on counsel's acquiescence in his wishes. (See discussion, *post,* at p. 120; see *Lang, supra,* 49 Cal.3d at pp. 1030-1031.) But once again, until counsel are afforded an opportunity to fully explain their reasons for refraining from making a penalty phase argument below, reasons that are not fully amplified in the record on appeal, there is neither an adequate factual or legal basis upon which to predicate a reversal of the death judgment on grounds of ineffective assistance of counsel.

---

[30]*Cronic* involved an indictment of a defendant on multimillion-dollar mail fraud charges. When the defendant's retained counsel withdrew shortly before the start of trial, the district court appointed a young and relatively inexperienced real estate attorney who had never before participated in a jury trial to represent the defendant, and afforded him only 25 days to prepare for trial. (*Cronic, supra,* 466 U.S. at pp. 649-650 [104 S.Ct. at pp. 2041-2042].) Nevertheless, the high court in *Cronic* on those facts held that the court of appeals had erred in finding a Sixth Amendment violation of the right to counsel that "was not supported by a determination that [the defendant's] trial counsel had made any specified errors, that his actual performance had prejudiced the defense, or that he failed to exercise 'the skill, judgment, and diligence of a reasonably competent defense attorney' . . . ," but instead "rested on the premise that no such showing is necessary 'when circumstances hamper a given lawyer's preparation of a defendant's case.' " (*Cronic, supra,* at p. 650 [104 S.Ct. at p. 2042].) Put differently, the high court in *Cronic* concluded that the court of appeals had erred in failing to require a showing of prejudice resulting from counsel's deficient performance under the second prong of *Strickland v. Washington, supra,* 466 U.S. 668.

Nor does the high court's recent decision in *Bell v. Cone* (2002) 535 U.S. 685 [122 S.Ct. 1843, 152 L.Ed.2d 914] (*Cone*) lend any further support to defendant's claim that his death judgment must be reversed on appeal, under the holding of *Cronic*, because counsel rendered ineffective assistance in waiving penalty phase arguments. In *Cone*, the defendant was convicted of, and sentenced to death for, the murder of an elderly couple in Memphis, Tennessee. (*Id.* at p. 689 [122 S.Ct. at p. 1847].) The defense conceded that the defendant had committed the murders, but sought to prove he was not guilty by reason of insanity. In furtherance of that effort, the defense presented evidence that the defendant "suffered from substance abuse and posttraumatic stress disorders related to his military service in Vietnam." (*Id.* at p. 690 [122 S.Ct. at p. 1848].) The jury rejected his insanity defense and found him guilty of two counts of first degree murder. The capital sentencing hearing took place the next day and lasted approximately three hours. (*Ibid.*) At that hearing, defense counsel made an opening statement in which he called the jury's attention to the mitigating evidence already before them and suggested that the defendant "was under the influence of extreme mental disturbance or duress, that he was an addict whose drug and other problems stemmed from the stress of his military service, and that he felt remorse." (*Id.* at p. 691 [122 S.Ct. at p. 1848].) After both sides rested, the junior prosecuting attorney gave a " 'low key' " closing argument, after which defense counsel waived closing argument, thereby "preventing the lead prosecutor, who by all accounts was an extremely effective advocate, from arguing in rebuttal." (*Id.* at p. 692 [122 S.Ct. at p. 1848].) Under these circumstances, the high court held, a state court's characterization of counsel's waiver of final argument as a competent tactical choice was not an "unreasonable" application of *Strickland v. Washington, supra,* 466 U.S. 668. (*Cone, supra,* at pp. 698-702 [122 S.Ct. at pp. 1852-1854].) Observing that the waiver of closing argument is "plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components" (*id.* at pp. 697-698 [122 S.Ct. at p. 1852]), the high court in *Cone* concluded that its holding in dicta in *Cronic, supra,* 466 U.S. 648—that prejudice may be presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" (*id.* at p. 659 [104 S.Ct. at p. 2047])—was inapplicable to defense counsel's waiver of closing argument.

Defendant seeks to distinguish *Cone* on its facts, pointing out that by the time of the capital sentencing hearing in that case, counsel had already put considerable mitigating evidence before the jury in connection with the guilt and sanity phases of trial, and in his opening penalty phase statement had brought that evidence to the jury's attention, urging them to consider it in determining the appropriate penalty. But we find another distinguishing

aspect of *Cone* of greater significance here—*Cone* had reached the high court in the procedural posture of a federal habeas corpus proceeding "[a]fter a hearing in which [defendant's] trial counsel testified" (*Cone, supra,* 535 U.S. at p. 685 [122 S.Ct. at p. 1845]), an evidentiary hearing that in turn furnished the basis for the state criminal court's rejection of Cone's claim that his counsel rendered ineffective assistance by failing to present mitigating evidence and .waiving final argument at the capital sentencing hearing, and its denial of postconviction habeas corpus relief. (*Ibid.*)

Here, we hold only that defendant's assertion that Miller and Maple rendered ineffective assistance of counsel in waiving penalty phase arguments must properly await resolution on a fully developed factual record in a habeas corpus proceeding appropriately instituted in conjunction with this appeal. The high court's decision in *Cone* fully supports that disposition of defendant's claim on appeal.

### 2. *Trial court error*

We now turn to defendant's closely related claim that the trial court erred in failing to protect his Sixth Amendment right to counsel by not following through on the court's initially stated intent to appoint new counsel for the purpose of making a penalty phase argument. Our dissenting colleagues agree with defendant's contention that once defendant answered "yes" to the court's initial inquiry as to whether he wanted substitute counsel appointed for the sole purpose of making an argument to the jury, the court had no choice but to appoint new counsel for that single purpose. On this state of the record we cannot agree.

It is true that the trial court expressed astonishment, as well might be expected, when Maple announced on behalf of himself and Miller that the defense would rest without presenting any argument to the jury. It is also true, however, that because Miller and Maple obviously believed that confidentiality or attorney-client privilege precluded them from informing the court of their reasons for electing their chosen course of action at the penalty trial, the court was left largely in the dark regarding counsel's reasons for failing to call any witnesses or present any mitigating evidence. Although the court questioned defendant at the conclusion of the prosecution's case in aggravation of penalty and did learn that defendant had consulted with counsel, had been informed of his right to present mitigating evidence, and was forgoing exercise of that right, the court apparently was not aware that defendant had instructed his family members not. to cooperate with the defense investigation, had steadfastly refused to assist Miller, Maple, and defense investigator Sickler in any way with their investigation of a penalty

phase defense, and had refused all contact or communication with counsel and the investigator, with the exception of two contacts with Attorney Maple, one on July 12, 1990, five days before the scheduled start of the penalty trial, and the other on July 17, 1990, the day the penalty trial commenced. In those two contacts with Maple, defendant confirmed that he had refused any interviews with Miller and investigator Sickler, and had instructed members of his family not to cooperate or assist in any investigation by the defense. Defendant also agreed with Maple that as a result of his altercation with sheriff's deputies in the jail, evidence from institutional records of his good conduct while incarcerated over the years should not be presented to the jury.

The record further reflects that the court was laboring under the mistaken assumption that this court's 1985 decision in *People v. Deere, supra,* 41 Cal.3d 353 (*Deere I*), required counsel to present any available evidence in mitigation of penalty *even over a defendant's expressed objections*. This was not the state of the law, however, by the time defendant's penalty phase was conducted in July 1990.

As we explained in *People v. Deere* (1991) 53 Cal.3d 705 [280 Cal.Rptr. 424, 808 P.2d 1181] (*Deere II*), in response to Deere's claim that his counsel rendered ineffective assistance in failing to present evidence in mitigation: "The claim is totally without merit, if not specious. [¶] As noted earlier, we held in *Deere I, supra,* 41 Cal.3d 353, that defendant was denied adequate representation at the penalty phase as a result of counsel's failure to present evidence in mitigation, notwithstanding defendant's unequivocal desire that no such evidence be presented. Defendant was represented at the penalty retrial by the same deputy public defender who had appeared on his behalf at the first trial. Defendant's views with respect to the presentation of mitigating evidence also remained unchanged; defendant was adamant, in counsel's words, that '[h]e does not want any evidence presented on his behalf because in his heart that is his private life and to bring that evidence into court would violate his relationships with everybody he holds dear and respects in this world. And to him, those relationships are more important than anything else, including his life.' [¶] Thus, counsel was confronted with the unenviable and wrenching choice of obeying the law as defined by this court in *Deere I*, or honoring his client's deeply held convictions. To make the dilemma even more acute, the trial court ordered counsel to present whatever mitigating evidence was available in accordance with our decision, or be held in contempt." (*Deere II, supra,* at p. 714.)

We went on to explain in *Deere II*, in the following three quoted paragraphs, that:

"Furthermore, decisions subsequent to the instant penalty retrial have largely undermined the court's holding in *Deere I.* As explained in *People* v. *Bloom* (1989) 48 Cal.3d 1194 [259 Cal.Rptr. 669, 774 P.2d 698], which held that a sentence of death was not constitutionally unreliable merely because a self-represented defendant chose not to present mitigating evidence at the penalty phase: 'To the extent that *Deere, supra,* 41 Cal.3d 353, suggests that failure to present mitigating evidence in and of itself is sufficient to make a death judgment unreliable, *it is based on a mistaken understanding of the Eighth Amendment's reliability requirement and its reasoning in that regard is hereby disapproved.*' (*Id.* at p. 1228, fn. 9, italics added.) Rather, 'the required reliability is attained when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present.' (*Id.* at p. 1228.)

"We further underscored our disapproval of *Deere I* in *People* v. *Lang* [, *supra,*] 49 Cal.3d 991 . . . : '*Deere* was disapproved [in *People* v. *Bloom*] to the extent it suggests that a defendant's failure to present mitigating evidence, in and of itself, is sufficient to make a judgment of death constitutionally unreliable.' (*Id.* at p. 1030.) Indeed, *Lang* went on to reject explicitly the proposition that 'defense counsel should be forced to present mitigating evidence over the defendant's objection,' noting that it contravenes the attorney's 'paramount duty of loyalty to the client,' undermines 'the trust, essential for effective representation, existing between attorney and client,' and ultimately reduces the quality of that representation by forcing defendants 'who otherwise would not have done so to exercise their Sixth Amendment right of self-representation . . . . in order to retain control over the presentation of evidence at the penalty phase . . . .' (*Id.* at pp. 1030-1031.)

"Finally, as further noted in *People* v. *Lang*, a defendant who insists that mitigating evidence not be presented at the penalty phase is estopped from later claiming ineffective assistance based on counsel's acquiescence in his wishes. 'The invited-error doctrine operates, in particular, to estop a defendant claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests.' (49 Cal.3d at p. 1032, fn. omitted.)" (*Deere II, supra,* 53 Cal.3d at pp. 716-717.)

*Bloom* was decided in June 1989. *Lang* was decided in December 1989. By the time of defendant's penalty trial in July 1990, our decisions in *Lang* and *Bloom* had announced that the rule of *Deere I*—that counsel was

required to present any available evidence in mitigation of penalty even over the defendant's objection—was disapproved. It is clear from the transcript of the July 18 proceedings that the trial court in this case mistakenly believed *Deere I* obligated Miller and Maple to present any available mitigating evidence *even over defendant's objections*.[31] And although it cannot be discerned with certainty from this record whether Miller, Maple, and Gerstein knew that the court was laboring under a mistaken understanding of the applicable law, we surmise from the transcript of the July 18 proceedings that the disparity between the court's and counsel's understanding of counsel's obligation to present mitigating evidence *even over defendant's objection*, was at the heart of the standoff between counsel and the court that led the court to suggest it might need the assistance of a member of the State Bar, and Miller and Maple to respond by securing the attendance of Attorney Gerstein to explain to the court that counsel had their confidential reasons for refusing to present any mitigating evidence.

Although the record on appeal is less clear regarding Miller and Maple's specific reasons for waiving penalty phase argument than it is regarding their reasons for failing to call any witnesses or present any mitigating evidence, the record rather clearly reflects that once the trial court was satisfied that Miller and Maple had their reasons for not presenting any mitigating evidence, the court was also inclined to accept that they had tactical or other sound reasons for waiving penalty phase argument, and to defer to their judgment in that regard as well.

Our dissenting colleagues conclude that "the court's erroneous acceptance of counsel's waiver of argument, *following as it did their decision not to make any opening statement, present any mitigating evidence, or cross-examine any of the People's witnesses,* resulted in what may be described either as a 'complete denial of counsel' (*United States v. Cronic, supra,* 466 U.S. at p. 659 [104 S.Ct. at p. 2047]) at the critical stage of jury argument or as a complete failure of the defense to subject the prosecution's penalty phase case 'to meaningful adversarial testing' (*ibid.*). Either way, 'there has been a denial of Sixth Amendment rights that makes the adversarial process itself presumptively unreliable.' (*Ibid.*)" (Conc. & dis. opn. of Werdegar, J., *post,* at pp. 135-136, italics added.) As the italicized language above reveals, although the dissent purports to argue that *trial court error alone* requires reversal on appeal, in actuality the dissent has concluded that the trial court's refusal to appoint new counsel to make a penalty phase argument, *in the face*

---

[31]"The Court: I've cited the *Deere* [*I*] case on the record. [¶] Mr. Gerstein: Yes. [¶] The Court: That requires them, as officers of the court, to present factors in mitigation, if any. [¶] The Court [*sic:* Mr. Gerstein]: Well, yes, your Honor. That was precisely their—that was precisely their concern."

*of counsel's omissions and ineffective representation leading up to that determination,* together resulted in a violation of defendant's Sixth Amendment right to counsel. The problem with this reasoning is that our precedents normally do not permit us to conclude that counsel's performance fell below an objectively reasonable standard of representation on a cold record on appeal. (*People v. Mendoza Tello, supra,* 15 Cal.4th 264.) The circumstances related in Miller's, Maple's, and investigator Sickler's confidential declarations serve as a good example of the reason for the rule.

We conclude that if, on an appropriately expanded factual record on habeas corpus, Miller and Maple are shown to have acted within an objectively reasonable standard of representation (*Strickland v. Washington, supra,* 466 U.S. at pp. 688, 694 [104 S.Ct at pp. 2064-2065, 2068]) in refraining from presenting any argument to the jury *consistent with what they reasonably believed were their client's wishes,* it would be anomalous, in the face of such an informed finding, to fault the trial court for ultimately deferring to counsel's judgment and determining not to substitute new counsel in the eleventh hour of this trial. To reverse the judgment on appeal for trial court error without garnering all the relevant facts would be tantamount to handing defendant a technical victory when, in actuality, defendant may have received precisely the kind of penalty phase representation he desired and sought below. We therefore reject defendant's claim that the trial court's failure to appoint new counsel to make a penalty phase argument violated his Sixth Amendment right to counsel. The Sixth Amendment claim is more appropriately addressed in the context of the claim of ineffective assistance of counsel, which must be presented in a habeas corpus petition in conjunction with this appeal.

We caution that our conclusion in this regard must not be understood as an endorsement of the wholesale abdication of all meaningful representation of a client by counsel at the penalty phase of a capital murder trial. This penalty phase had none of the hallmarks of a capital sentencing proceeding whereby the defense makes a determined effort to convince the jury to spare the defendant's life. But the question posed is not whether a penalty phase in which there is no defense opening statement, no cross-examination of the prosecution's witnesses, and no presentation of defense evidence or argument in mitigation of penalty, can ever, as a matter of sound trial tactics, lead to a reliable penalty verdict. Rather, the question left open for decision on habeas corpus is whether counsel's failure to present a penalty phase argument did or did not fall within an objectively reasonable standard of penalty phase representation (*Strickland v. Washington, supra,* 466 U.S. at pp. 688, 694 [104 S.Ct. at pp. 2064-2065, 2068]) in light of the totality of circumstances which counsel faced at the penalty trial below. If, on a fully

developed factual record on habeas corpus, counsel's decision to refrain from making a penalty phase argument is shown to have fallen within that standard, then defendant may be estopped at the threshold from claiming ineffective assistance of counsel (*Lang, supra,* 49 Cal.3d at pp. 1030-1031), and as a consequence of his refusal to cooperate and reasonably communicate with counsel and their defense investigator, defendant would bear the ultimate responsibility for the irregularity of his penalty phase proceedings below. On the other hand, if, on a fully developed factual record, it is shown that counsel's decision to forgo penalty phase argument fell below the applicable standard of competent representation, we will not hesitate to reverse the penalty judgment on habeas corpus and remand the matter for a new penalty trial.

XXIV. *Inadequate Response to Jury Question About Parole*

During its penalty deliberations, the jury sent out a note asking, "If we give life imprisonment without possibility of parole, can we be assured he will never be[] released from prison." Defense counsel urged the court to tell the jury "life imprisonment without possibility of parole means exactly what it said." The court instead told the jury to reread the instructions and that "we will have you apply common meaning to the two possible verdicts of death or life imprisonment without possibility of parole." Defendant contends this response violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

We disagree. The court's response did not differ significantly from that which defense counsel sought. The "common meaning" of "life imprisonment without possibility of parole" is that the defendant will be imprisoned for the rest of his life, without any possibility of release on parole. This is the same meaning conveyed by counsel's suggested response that the term "means exactly what it said." The court's response also satisfied our holding in *People v. Kipp* (1998) 18 Cal.4th 349 [75 Cal.Rptr.2d 716, 956 P.2d 1169], that when the jury expresses a concern regarding the effect of a life without parole sentence, the court should instruct the jury "to *assume* that whatever penalty it selects will be carried out" or give "a comparable instruction." (*Id.* at pp. 378-379.)

Three United States Supreme Court decisions stemming from death sentences imposed under South Carolina law are readily distinguishable, in that the juries in those cases were told that the alternative to a death sentence was one of "life imprisonment" without instruction that a capital defendant given such a sentence would not be eligible for parole. (*Kelly v. South Carolina* (2002) 534 U.S. 246, 250 [122 S.Ct. 726, 729-730, 151 L.Ed.2d 670]; *Shafer*

*v. South Carolina* (2001) 532 U.S. 36, 44-45 [121 S.Ct. 1263, 1269-1270, 149 L.Ed.2d 178]; *Simmons v. South Carolina* (1994) 512 U.S. 154, 158-160 [114 S.Ct. 2187, 2191-2192, 129 L.Ed.2d 133].) Here, the jury was told that the alternative to death was life imprisonment "without possibility of parole," and that that phrase should be understood in its ordinary sense. Those instructions were sufficient to inform the jury that defendant would not be eligible for parole.

XXV. *Failure to Instruct, Sua Sponte, That Jury Could Choose Life Sentence Even if It Found No Mitigating Evidence*

 Defendant contends the trial court should, on its own motion, have instructed the jury to the effect that "[t]he jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death." (*People v. Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131] [stating principle].) The court's failure to do so assertedly violated defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

The jury here was instructed that it could consider in mitigation "[a]ny other circumstance which extenuates the gravity of the crime . . . and any sympathetic or other aspect of the defendant's character or record" (CALJIC No. 8.85, factor (k)), that the weighing of aggravating and mitigating circumstances is not "a mere mechanical counting of factors on each side of an imaginary scale" (CALJIC No. 8.88), that the jury was free "to assign whatever moral or sympathetic value you deem appropriate" to each factor (*ibid.*), and that a death sentence could be returned only if each juror found the aggravating circumstances "so substantial" in relation to the mitigating ones as to warrant that penalty (*ibid.*). As in previous cases, we find no reasonable likelihood that a juror so instructed would believe he or she was required to impose death, despite insubstantial aggravating evidence, merely because no mitigating circumstances were found. (*People v. Anderson* (2001) 25 Cal.4th 543, 600, fn. 20 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673].) In addition, the jury here was instructed, on the court's own motion, "not to draw any adverse inferences from the defendant's failure to . . . offer evidence in mitigation or arguments by his attorneys. [¶] The jury must decide for itself the appropriate penalty based on the factors previously given by the court." This special instruction further guarded against the possibility a juror would believe the absence of mitigating evidence mandated a sentence of death.

## XXVI. *Inadequate Instruction on Lingering Doubt*

 Defense counsel submitted a proposed instruction on lingering or residual doubt. The court gave the instruction as modified, omitting certain text, which apparently consisted of the struck-through portions below:

"Although proof of guilt beyond a reasonable doubt has been found, you may demand a greater degree of certainty for the imposition of the death penalty. The adjudication of guilt is not infallible and any lingering doubt you entertain on the question of guilt may be considered by you in determining the appropriate penalty, including the possibility that at some time in the future, facts may come to light that have not yet been discovered. Each individual juror may consider as a mitigating factor residual or lingering doubt as to whether the defendant killed the victim. Lingering or residual doubt is defined as a state of mind between beyond a reasonable doubt and all possible doubt. Thus if any individual juror has a lingering or residual doubt about whether the defendant intentionally killed the victim, he or she must may consider this as a mitigating factor and assign to it the weight you deem appropriate."

Defendant contends the court's modification diluted the instruction on lingering doubt, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We disagree. Though we have characterized the omitted second sentence of the defense proposal favorably as a "straightforward instruction" (*People v. Morris* (1991) 53 Cal.3d 152, 219 [279 Cal.Rptr. 720, 807 P.2d 949]), we have never suggested that it was required in every, or any, case. The remaining portions adequately convey the concept of lingering doubt and its proper relevance to the penalty decision. Nor does defendant cite any decision holding that a juror's lingering doubt "must," as opposed to "may," be considered in mitigation. (See *Tuilaepa v. California* (1994) 512 U.S. 967, 979 [114 S.Ct. 2630, 2638, 129 L.Ed.2d 750] ["A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision"].)

## XXVII. *Constitutional Challenges to California's Death Penalty Law*

 Defendant contends that the 1978 death penalty scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in several respects.

As defendant concedes, we have previously rejected many of his claims in this regard. Thus, we have held:

The special circumstances listed in section 190.2 adequately narrow the class of murders for which the death penalty may be imposed. (*People v.*

*Anderson, supra,* 25 Cal.4th at p. 601; *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Frye, supra,* 18 Cal.4th at p. 1029.)

The statute is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Ochoa, supra,* 19 Cal.4th at p. 479; *People v. Frye, supra,* 18 Cal.4th at p. 1029.)[32]

The jury may consider prior unadjudicated criminal activity under section 190.3, factor (b). (*People v. Jenkins* (2000) 22 Cal.4th 900, 1054 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1178 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Prosecutorial discretion to select those death-eligible cases in which the death penalty will actually be sought is not constitutionally impermissible. (*People v. Anderson, supra,* 25 Cal.4th at pp. 601-602; *People v. Kipp, supra,* 26 Cal.4th at p. 1137; *People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081].)

Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required. (*People v. Kipp, supra,* 26 Cal.4th at

---

[32]In his reply brief, defendant argues that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] mandates that aggravating circumstances necessary for the jury's imposition of the death penalty be found beyond a reasonable doubt. We reject that argument for the reason given in *People v. Anderson, supra,* 25 Cal.4th at pages 589-590, footnote 14: "[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*" The high court's recent decision in *Ring v. Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 [122 S.Ct. at p. 2440].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt.

p. 1139; *People v. Lucero* (2000) 23 Cal.4th 692, 741 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

International law does not compel the elimination of capital punishment in California. (*People v. Ghent* (1987) 43 Cal.3d 739, 779 [239 Cal.Rptr. 82, 739 P.2d 1250].)

We are not persuaded that we should reconsider our previous rulings on these issues.

Defendant, relying on a dissenting opinion in *Jeffers v. Lewis* (9th Cir. 1994) 38 F.3d 411, 425-427, contends that the administration of California's death penalty is impermissibly arbitrary in that, out of the many people sentenced to death, only an unsystematically chosen few have yet been executed. The federal appellate court has rejected this argument (*Woratzeck v. Stewart* (9th Cir. 1997) 118 F.3d 648, 652); we do so as well. "If Woratzeck's death sentence does not violate the Eighth Amendment, then neither does the scheduling of his execution. Arizona must establish some order of execution. There has been no prima facie showing that this scheduling violates the Eighth Amendment." (*Ibid.*) The same is true here. Defendant does not face imminent execution and can hardly claim he is being singled out for either quick or slow treatment of his appeal and habeas corpus proceedings. More generally, defendant makes no showing that the number of condemned prisoners executed in California, or the order in which their execution dates are set, is determined by any invidious means or method, with discriminatory motive or effect, or indeed according to anything other than the pace at which various defendants' appeals and habeas corpus proceedings are concluded, a matter by no means within the sole control of the state.

XXVIII. *Delay in Hearing Defendant's Appeal and His Execution After Such Delay*

Defendant contends that the delay in appointing appellate counsel and hearing this automatic appeal (from the judgment in September 1990 to the present) deprived him of due process, and that his execution after such delay would serve no legitimate penological purpose and would therefore violate the Eighth Amendment to the United States Constitution. We have rejected substantially identical contentions in several recent cases (*People v. Ochoa* (2001) 26 Cal.4th 398, 462-464 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Anderson, supra,* 25 Cal.4th at pp. 605-606; *People v. Frye, supra,* 18 Cal.4th at pp. 1030-1031) and find no cause to reconsider those decisions here.

XXIX. *Challenges to the Method of Execution*

Defendant raises various challenges to the constitutionality of execution by lethal injection and by lethal gas. We have previously rejected such

claims as noncognizable on appeal and as lacking merit. (See *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213] [claim noncognizable because "an imperfection in the method of execution does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal"; claim as to lethal injection also fails on merits because it is "based on anecdotal evidence of the administration of lethal injection in other states, and does not support a conclusion that this method of execution as administered in California violates the Eighth Amendment"]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1058-1059 [60 Cal.Rptr.2d 225, 929 P.2d 544] [lethal gas not unconstitutional method in light of § 3604, subd. (b), which provides persons under sentence of death with the choice of gas or injection; claim also premature in that it does not bear on the validity of the death sentence itself].) Nor can the application to defendant of section 3604, as amended in 1992, be considered an ex post facto law or a bill of attainder, for it did not increase, or make more burdensome in any way, defendant's punishment. (See *Vickers v. Stewart* (9th Cir. 1998) 144 F.3d 613, 617; *Poland v. Stewart* (9th Cir. 1997) 117 F.3d 1094, 1105.)

### XXX. *Cumulative Prejudice from Errors*

Defendant contends that the prejudicial effect of all guilt and penalty phase errors, taken together, requires reversal of the judgment or, at least, of the death penalty. Having found no prejudicial error, we see no grounds for reversal.

### DISPOSITION

The judgment of the superior court is affirmed.

**WERDEGAR, J.,** Concurring and Dissenting.—While I concur in the court's affirmance of defendant's murder conviction and the special circumstance findings, I dissent from the court's affirmance of the death penalty in this case. In my view, the trial court's error in failing to provide defendant an attorney to argue for his life requires reversal of the judgment as to penalty. This being so, I do not address any claim of ineffective assistance of counsel.

As the majority acknowledges, the course of this penalty trial was highly unusual and troubling. Defense counsel, having rested without making an opening statement, presenting any evidence, or cross-examining any witnesses, announced their intent to submit the case without any argument as well. Counsel then refused not only to give a reason for this decision, but even to indicate in a general way what type of reason (e.g., strategic, ethical, client direction) they had. Nor would counsel say why no reason could be

given. Essentially, counsel stonewalled the court. The court asked defendant whether he wanted a different attorney appointed to argue for him; defendant replied that he did. The court nonetheless failed to appoint a new attorney. Rather, on the assurance of another attorney that appointed counsel had some still undisclosed reason not to argue for their client's life, the court ultimately accepted counsel's waiver of argument.

Argument to the jury is, of course, a critical stage of trial, at which assistance of counsel is vital. (See *Herring v. New York* (1975) 422 U.S. 853, 858 [95 S.Ct. 2550, 2553, 45 L.Ed.2d 593] ["There can be no doubt that closing argument for the defense is a basic element of the adversary fact-finding process in a criminal trial"]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184 [36 Cal.Rptr.2d 235, 885 P.2d 1] ["It is firmly established that a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact"].) Although defendant personally waived the presentation of mitigating evidence on his behalf, he did not waive—indeed, he expressly *requested*—the presentation of an argument to the jury. The trial court's unwarranted refusal in the face of that request to appoint an attorney who would argue for defendant at the penalty phase deprived him of a fundamental right guaranteed by the Sixth Amendment to the United States Constitution. The error, moreover, was prejudicial: defendant's complete lack of representation at this critical phase of trial renders the penalty verdict constitutionally unreliable and requires its reversal. (*United States v. Cronic* (1984) 466 U.S. 648, 659 [104 S.Ct. 2039, 2047, 80 L.Ed.2d 657].)

California precedents make clear a trial court may not thus abdicate its duty to ensure a criminal defendant the assistance of counsel. In *People v. McKenzie* (1983) 34 Cal.3d 616 [194 Cal.Rptr. 462, 668 P.2d 769], limited on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365 [121 Cal.Rptr.2d 580, 48 P.3d 1136], defense counsel refused to participate in the trial because of the court's adverse pretrial rulings, including denial of a continuance to prepare a defense. Acknowledging that counsel's difficulties were created by defendant's refusal to cooperate, the trial court ruled that defendant had waived his constitutional rights, and thus allowed the trial to proceed without counsel's participation. Because the defendant had been removed from the courtroom at the outset of trial due to disruptive behavior, his views concerning counsel's nonparticipation or the substitution of counsel were never expressed. (*McKenzie, supra,* at pp. 624-625.) *McKenzie* thus was a *weaker* case on appeal than the present one, where defendant expressly requested new counsel. We nonetheless held that appointment of substitute counsel would have been a proper trial court response (*id.* at pp. 629-630) and that the court erred by instead "allowing this defendant to proceed to trial without the assistance of counsel" (*id.* at p. 627).

The Court of Appeal reached the same conclusion in *People v. Shelley* (1984) 156 Cal.App.3d 521 [202 Cal.Rptr. 874]. There, the defense attorney, dissatisfied with certain trial court rulings, announced during trial that he would continue to be present but would no longer participate in any way. (*Id.* at pp. 524-525.) Although the prosecutor suggested counsel was trying to create "a ground for appeal," counsel later stated he was only trying "to show the court the depth of my conviction" that its rulings were wrong. (*Id.* at pp. 525, 529.) The court allowed the trial to proceed to a jury verdict without counsel's participation. (*Id.* at p. 527.)

Whatever the reason for counsel's choice, the Court of Appeal held, the trial court should not have acceded to counsel's inaction on the ground that it was or could be described as a "tactic." If defense counsel absolutely refuses to participate in the trial, the court "must appoint substitute counsel." (*People v. Shelley, supra,* 156 Cal.App.3d at p. 531.) The court's failure to do so "breached its duty to safeguard appellant's right to the effective assistance of counsel and to ensure the orderly administration of justice." (*Id.* at p. 532.) *Shelley*, like *McKenzie*, was a weaker case than this one, because the defendant there said he agreed with counsel's nonparticipation (*Shelley, supra,* at p. 527), whereas here, of course, defendant instead asked for another lawyer to be appointed to do what his current lawyers refused to do.

The majority suggests defendant may, contrary to his express and unambiguous statement on the record, have harbored a desire to dispense with argument, a desire the majority speculates appointed counsel inferred from defendant's behavior at his first trial (eight years earlier, in 1982) and his asserted lack of cooperation in investigating his family background. While anything is possible, nothing in the record of the present trial—and more important, *nothing before the trial court* when it accepted counsel's waiver of argument—supports such an assumption.

The possibility defendant wished to waive argument certainly occurred to the court, which directly asked lead counsel if that were the case:

"The Court: . . . Mr. Miller, is this pursuant to the wishes of the defendant?

"Mr. Miller: Your Honor, I'm in no position to answer the court's question."

Having received this unhelpful response, the trial court turned to defendant:

"The Court: . . . I want you to be aware, if you want someone to argue in your behalf, I will gladly appoint another lawyer and to have him review this

case for purposes of arguments. . . . There are so many aspects to factors in mitigation as to your case. You understand this Mr. Snow?

"The Defendant: Yes.

"*The Court: Do you wish the court to appoint another lawyer in your behalf?*

"*The Defendant: Yes.*

"*The Court: Thank you. This will be for the purposes of the arguments in this case. Do you understand this?*

"*The Defendant: (Defendant nods head in the affirmative.)*"[1] (Italics added.)

With the question of defendant's wishes thus resolved, the court prepared to obtain new counsel, asking its clerk to contact an attorney, Mort Borenstein, known to the court as resourceful and competent. The court's subsequent colloquy with Attorney Robert Gerstein (who appeared to argue for retention of appointed counsel Miller and Maple) shed no additional light on defendant's wishes, as Gerstein expressly stated he had no information to provide on that subject:

"Mr. Gerstein: I've—I understand—what I do want to say, your Honor, is that they are representing the client's best interests in their professional judgment. Now, I did not mean to—

"The Court: That's all I want to hear.

"Mr. Gerstein: *—I did not mean to say by that that this was not the defendant's judgment or that it was the defendant's judgment,* that that was not taken into account." (Italics added.)

Thus the court, attempting to determine whether defendant wanted an attorney to argue for him at the penalty trial, first heard appointed counsel Miller refuse to answer the question, then heard defendant answer that he *did* want an attorney to argue for him, and finally heard Miller and Maple's attorney, Gerstein, say that he did not mean to say anything on the subject. The court, I submit, could not rationally conclude from this information that

---

[1]The trial court may have gone beyond its duties in inquiring of defendant whether he wanted new counsel to argue for him. That does not affect the court's duty, once it learned defendant in fact did wish to have counsel argue, to appoint such counsel.

defendant wished to waive representation at the argument phase or to waive argument itself.[2]

Indeed, the trial court's own comments, at the conclusion of the Gerstein discussion, show that its decision to accept counsel's waiver rested not on an intuition or inference regarding defendant's wishes *but on its acceptance of what the court took to be Gerstein's assurance that appointed counsel had a tactical reason for their course of action, an assurance Gerstein never gave and that counsel steadfastly refused to give.*

The court had earlier attempted to elicit from appointed counsel a statement that they had a tactical or strategic reason to waive argument. That attempt failed, as counsel simply refused to say anything about their reasons:

"The Court: . . . Does counsel for the defense wish to respond to the court's inquiry?

"Mr. Maple: I do not, your Honor.

"The Court: Mr. Miller?

"Mr. Miller: No, Sir. [¶] . . . [¶]

"The Court: . . . Not one word is being argued in his behalf as to the penalty aspect of this trial before this jury. May I know why, counsel? Mr. Miller, have you any reply?

"Mr. Miller: No, sir. No, your Honor.

"The Court: Mr. Maple?

"Mr. Maple: No, your Honor. [¶] . . . [¶]

[2]The majority's reliance on *People v. Lang* (1989) 49 Cal.3d 991, 1029-1033 [264 Cal.Rptr. 386, 782 P.2d 627] (maj. opn., *ante*, at p. 120) is thus misplaced. *Lang* involved the defense's decision to forgo a particular piece of mitigating evidence, not to waive argument to the jury. The claim was ineffective assistance of counsel, not trial court error in failing to appoint counsel. Most important, in *Lang*, the defendant's desire not to have the evidence presented appeared in the record (*Lang, supra,* at p. 1029); here, in contrast, defendant specifically and expressly stated that he *did* want argument presented on his behalf. The last fact crucially distinguishes *Lang* and similar decisions, which simply recognize that counsel has no obligation to pursue penalty phase strategies contrary to the expressed wishes of the client. (See, e.g., *People v. Howard* (1992) 1 Cal.4th 1132, 1183-1186 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People v. Deere* (1991) 53 Cal.3d 705, 713-717 [280 Cal.Rptr. 424, 808 P.2d 1181].)

"The Court: Thank you. Is this pursuant to tactical reasons that you may have developed in the course of this trial?

"Mr. Miller: I cannot answer the court's question."[3]

After the discussion with Gerstein, however, the court noted that Gerstein had, in the court's view, answered the question appointed counsel would not answer:

"The Court: Now, with your statement, it appears that it's solely tactical, and the presumption is that evidence to the contrary, the appellate court will take that presumption.

"Mr. Gerstein: Well, your Honor, perhaps I have gone too far in saying that.

"*The Court: Well, you made the statement and I've accepted it.*" (Italics added.)

The court then said it would accept the waiver and submit the case to the jury without defense argument.

Although the trial court correctly sought to determine, before appointing new counsel, whether current counsel had a valid tactical reason for waiving argument over the objection of their client, the court erred in finding, on the information before it, that counsel did have such a reason. The appointed attorneys refused to say whether they had such a reason. Attorney Gerstein stated that Miller and Maple believed they were acting in their client's best interest, but expressly disavowed any representation that their reasons were tactical:

"Mr. Gerstein: . . . *I have no intention of saying . . . that it was a tactical decision as opposed to any other sort of decision.*" (Italics added.)

Nor do the circumstances known to the trial court at the time of its decision to accept counsel's waiver of argument indicate the presence of a

---

[3]According to the majority, Miller and Maple "believed that confidentiality or attorney-client privilege precluded them from informing the court of their reasons for electing their chosen course of action at the penalty trial." (Maj. opn., *ante*, at p. 118.) As to counsel's decision to waive argument, this statement is without support in the record. Counsel steadfastly refused to give the trial court any indication of their reasons for that intended waiver, including any indication of why they could not or would not give their reasons.

legitimate tactical or strategic reason for the waiver. Leaving one's client defenseless, without any evidence or argument on his behalf, at a capital sentencing hearing, when the facts of the crime and the prosecution's evidence of aggravating circumstances give the jury ample reason to find death the appropriate punishment, is neither a generally recognized nor an acceptable strategy for capital representation. (See *Kubat v. Thieret* (7th Cir. 1989) 867 F.2d 351, 368 [presentation of a "grossly substandard argument" at a capital sentencing hearing, after failing to present evidence in mitigation, was not a "competent strategic decision"]; *Smith v. Stewart* (9th Cir. 1998) 140 F.3d 1263, 1268-1269 [capital counsel who presented no mitigating evidence and, in argument, made only "a few asthenic comments to the effect that Smith still denied his guilt and that he was just 30 years of age" had no tactical reason]; *Clabourne v. Lewis* (9th Cir. 1995) 64 F.3d 1373, 1387 [making of perfunctory penalty argument, after presenting no mitigating evidence, " 'amount[ed] in every respect to no representation at all' "].)[4]

The Attorney General suggests counsel were pursuing a "strategy" of failing to perform on defendant's behalf so as to "preserve an inadequacy of counsel issue for appeal." As Miller and Maple refused to give a reason for their decision not to argue on defendant's behalf, any assignment of reasons to them would be speculative. But even assuming the trial court made the same guess as the Attorney General now makes, the court nonetheless erred, as such a plan on counsel's part could not be characterized as a competent strategy. Miller and Maple were defendant's *trial* attorneys. Their job was to defend him zealously and with all their skill against the People's criminal charges. While a trial attorney should seek to preserve potential appellate issues as they arise, he or she must not abandon the effort to provide a competent trial defense in the hope of *creating* a claim for appeal. (See Rules Prof. Conduct, rule 3-110(A) [attorney "shall not intentionally . . . fail to perform legal services with competence"].)

---

[4] *Bell v. Cone* (2002) 535 U.S. 685 [122 S.Ct. 1843, 152 L.Ed.2d 914], cited by the majority (maj. opn., *ante*, at p. 117), is readily distinguishable. The defense there had put on considerable mitigating evidence in an earlier stage of trial. At the penalty trial (held the day after the jury returned its guilt verdicts), defense counsel made an opening statement in which he called the jury's attention to the mitigating evidence already before them and argued the defendant was remorseful and the jury should exercise mercy and spare his life. (535 U.S. at p. 691 [122 S.Ct. at p. 1848].) After both sides rested, the junior prosecutor gave a " 'low key' " closing argument; the defense then waived closing argument, "preventing the lead prosecutor, who by all accounts was an extremely effective advocate, from arguing in rebuttal." (*Id.* at p. 692 [122 S.Ct. at p. 1848].) In the present case, in contrast, the defense introduced no mitigating evidence at the guilt *or* penalty phase. The penalty trial took place more than a month after the guilt verdicts were returned, and the defense gave no opening statement. Moreover, before penalty argument began, the trial court ruled that the People would have no opportunity to rebut, and both prosecutors consequently gave their closing arguments before the defense was called on to argue. The factors that arguably justified a tactical waiver of final argument in *Bell v. Cone* were entirely absent here.

Abandoning the effort to conduct a defense at trial is not a competent tactical choice, whatever the reason. Even if counsel believed, for example, that the court's earlier rulings had made the penalty trial unfair, they could not competently abandon their client in the hope of securing a reversal on appeal. Once assigned to represent a criminal defendant, an attorney "is bound to do so to the best of his abilities under the circumstances," even in the face of adverse rulings counsel believes are incorrect. (*People v. McKenzie, supra,* 34 Cal.3d at p. 631.) "A refusal to participate in formulating or conducting a defense is not generally among the available strategic options." (*Ibid.*)

The trial court's first instinct was correct: faced with appointed defense attorneys who refused, without any explanation and against defendant's expressed wishes, to perform as advocates for the life of their client, the court should have relieved them and appointed a new attorney. (See Code Civ. Proc., § 284, subd. 2 [attorney in action "may be changed" at any time "upon the application of [the] client"]; *Smith v. Superior Court* (1968) 68 Cal.2d 547, 558 [68 Cal.Rptr. 1, 440 P.2d 65] [quoted statute applies in criminal cases].) On the defendant's motion, substitution of attorneys is compelled when there is " 'a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if his request was denied.' " (*People v. Clark* (1992) 3 Cal.4th 41, 104 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 87-88 [270 Cal.Rptr. 817, 793 P.2d 23].) That a capital defendant's right to counsel is substantially impaired through continued representation by attorneys who, against the defendant's wishes and for no apparent tactical or strategic reason, refuse to argue for the defendant's life, is, I believe, too clear to require further discussion.

As nothing before the trial court reasonably indicated either defendant's concurrence in counsel's waiver or a legitimate reason (ethical, strategic, or tactical)—indeed, everything before the court refuted both—the court erred in accepting the waiver and sending the case to the jury without any attorney to argue for the defense. The court's error resulted in the complete absence of an attorney's assistance to defendant at a critical stage of trial, a clear deprivation of his Sixth Amendment right to counsel. The error was prejudicial, for the court's erroneous acceptance of counsel's waiver of argument, following as it did their decision not to make any opening statement, present any mitigating evidence, or cross-examine any of the People's witnesses, resulted in what may be described either as a "complete denial of counsel" (*United States v. Cronic, supra,* 466 U.S. at p. 659 [104 S.Ct. at p. 2047]) at the critical stage of jury argument or as a complete failure of the defense to

subject the prosecution's penalty phase case "to meaningful adversarial testing" (*ibid.*). Either way, "there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*Ibid.*)[5]

Acknowledging that a bona fide argument for sparing the defendant's life may virtually always be made at the penalty phase, the majority nonetheless suggests that here Miller and Maple had nothing to argue because no mitigating evidence had been introduced. To the contrary, I believe the concept of residual or lingering doubt—which does not depend on introduction of mitigating evidence—would have provided the basis for an appropriate and possibly effective penalty argument in this case.[6] The case in aggravation rested primarily on the facts of the murder for which defendant was convicted. The evidence upon which the jury convicted, while legally sufficient, was entirely circumstantial and was far from absolutely conclusive; it consisted mainly of proof of motive and opportunity, together with a single fingerprint on a visor found elsewhere in Pasadena on the day of the killing, the unexplained presence of the victim's telephone number in defendant's notebook, and a prosecutor's testimony—contradicted by credible defense evidence—that defendant had reacted without emotion when told of the victim's death. That the jurors would have been unanimously willing to send a man to his death on such evidence, had counsel reminded them of the weaknesses in the prosecution case and argued vigorously for the appropriateness of a life sentence, was not a foregone conclusion.

The majority places great emphasis on declarations filed under seal with another department of the superior court, in which trial counsel revealed some of the events and discussions that purportedly underlay their decision not to present mitigating evidence at the penalty phase. For two simple reasons, however, those declarations are irrelevant to analysis of defendant's principal claim, which is that the court erred in not appointing an attorney to argue for him to the jury. First, the declarations relate to the investigation and presentation of mitigating evidence, not to the making of an argument to

---

[5]Contrary to the majority's suggestion (maj. opn., *ante*, at pp. 121-122), I refer to the fact no mitigating evidence was introduced *not* to demonstrate ineffective assistance of counsel, but only to explain how the court's later decision to submit the case to the jury without any attorney having argued for defendant resulted in a complete failure of adversarial testing at the penalty phase.

[6]The majority minimizes this potential argument with the remark that "then again, Miller had taken that tack at the second penalty phase of defendant's first trial," where it was unsuccessful. (Maj. opn., *ante*, at p. 115.) Insofar as the majority implies that Miller could, as a competent strategy, have decided to do *nothing* rather than make a legitimate argument that had failed to persuade a different jury, which had heard evidence in a different trial, I fail to see the majority's logic.

the jury. Second, and more important, *the declarations were not before the trial court at the time it decided to submit the case to the jury without defense argument.* They could not possibly have influenced the court and cannot logically be used to justify the court's decision. (See 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Appeal, § 142, p. 390; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 328, pp. 369-370 [matters not in record and not before trial court are not properly considered on appeal of judgment or order].)

For similar reasons, I disagree with the majority's view that consideration of defendant's principal claim—that the trial court erred in refusing to appoint new counsel for argument—is properly deferred until possibly raised in a future petition for writ of habeas corpus. The merits of defendant's claim, as of any claim of trial court error, must be measured by the information available to the trial court when it made the challenged decision. Posttrial declarations of counsel attempting to justify their waiver of argument may affect the analysis of an ineffective assistance of counsel claim, but can shed no light on the merits of a claim that the trial court erred, during trial, in denying defendant an attorney to argue for him at the penalty phase of trial. The issue in this appeal is not whether *this court can imagine* a satisfactory explanation for counsel's behavior, or whether one *may be put forward* in habeas corpus proceedings. The issue is, rather, whether the *trial court was given*, or could have inferred from information before it, a satisfactory explanation. On this question the appellate record is complete, and habeas corpus proceedings promise no greater insights.

I would hold simply that in the penalty phase of a capital case, when the defense has made no opening statement, called no witnesses, cross-examined none of the prosecution witnesses, presented no evidence in mitigation, and proposes to make no closing argument, the trial court should not accept counsel's waiver of penalty phase argument where that waiver is *contrary to the defendant's expressed wishes and is unaccompanied by any explanation from counsel.* The majority's contrary holding—that the court may accept counsel's waiver without any explanation and contrary to defendant's expressed wishes—seems to suggest that trial courts may turn a blind eye to an apparent abandonment of the client by appointed counsel in even the most serious of criminal cases. The possibility that Attorneys Miller and Maple will, in a habeas corpus proceeding years from now, come up with a post hoc explanation for their actions—an explanation they would not provide the trial court even in chambers and without the prosecutor present, and which

consequently would be of doubtful reliability—does not justify a holding that so undermines the appearance of justice in capital cases.

George, C. J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied June 25, 2003. George, C. J., Werdegar, J., and Moreno, J., were of the opinion that the petition should be granted.